60 F.3d 1116
 HARLEYSVILLE MUTUAL INSURANCE COMPANY; Huron Insurance
Company, Plaintiffs-Appellees,
v.
Kimberly Laws PACKER, Terry Wayne Packer, Guardian for the
foregoing, Defendant-Appellant,
and
Terry Wayne Packer, Individually; and as Guardian for
Kimberly Laws Packer and Guardian Ad Litem for Stephanie
Packer; Willard Ray Faircloth; Gladystine Faircloth;
Jonathan Keith Thornton; Oscar Mitchell Carter; Lawrence
Michael Brush; Ervin I. Baer, Administrator of the Estate
of Sidney Ray Sheppard, Jr.; Phillip J. Sheppard; John
C.W. Gardner; Betty C. Brown, Executrix of the Estate of
John H. Brown, d/b/a Sheppard Associates, a Partnership; H.
David Swain, Individually and d/b/a Swain Associates;
Stephanie Packer, Terry Wayne Packer, Guardian Ad Litem for
the foregoing, Defendants.
HARLEYSVILLE MUTUAL INSURANCE COMPANY; Huron Insurance
Company, Plaintiffs-Appellees,
v.
H. David SWAIN, Individually and d/b/a Swain Associates,
Defendant-Appellant,
and
Terry Wayne Packer, Individually; and as Guardian for
Kimberly Laws Packer and Guardian Ad Litem for Stephanie
Packer; Willard Ray Faircloth; Gladystine Faircloth;
Jonathan Keith Thornton; Oscar Mitchell Carter; Lawrence
Michael Brush; Ervin I. Baer, Administrator of the Estate
of Sidney Ray Sheppard, Jr.; Phillip J. Sheppard; John
C.W. Gardner; Betty C. Brown, Executrix of the Estate of
John H. Brown, d/b/a Sheppard Associates, a Partnership;
Kimberly Laws Packer, Terry Wayne Packer, Guardian for the
foregoing; Stephanie Packer, Terry Wayne Packer, Guardian
Ad Litem for the foregoing, Defendants.
 Nos. 94-2322, 94-2323.
 United States Court of Appeals,
Fourth Circuit.
 Argued May 1, 1995.
Decided July 31, 1995.
 
 ARGUED: Joe McLeod, The McLeod Law Firm, P.A., Fayetteville, NC, for appellant. James Anthony Penry, Wyrick, Robbins, Yates & Ponton, L.L.P., Raleigh, NC, for appellees.
 Before HALL, WILKINSON, and HAMILTON, Circuit Judges.
 Affirmed by published opinion. Judge HAMILTON wrote the majority opinion, in which Judge WILKINSON joined. Judge HALL wrote a dissenting opinion.
 OPINION
 HAMILTON, Circuit Judge:
 
 
 1
 Appellee Harleysville Mutual Insurance Company (Harleysville) sought a declaration that it was not liable to make payments under an insurance policy it issued to Appellant H. David Swain (Swain). Appellants Swain and Kimberly Packer (Packer) (collectively Appellants) contended that Harleysville was liable under the policy. On the parties' cross-motions for summary judgment, the district court granted summary judgment in favor of Harleysville, concluding that under the plain language of the policy, Harleysville was not liable because the vehicle that caused the collision was not a "private passenger type auto" under the terms of the policy. We affirm.
 
 I.
 
 2
 Sheppard Associates, trading under the name of "Quick Flick," was a North Carolina general partnership engaged in renting retail videotapes. The general partners of Sheppard Associates were Swain, John Gardner (Gardner), John Brown, and Phillip Sheppard (Jay Sheppard), who was the managing partner and ran the daily operations of the partnership. As Sheppard Associates prospered, Jay Sheppard purchased, among other motor vehicles, a 1986 Chevrolet Astro cargo van to transport the videotapes from various locations in furtherance of the partnership business. Significantly, this cargo van was purchased with partnership funds, titled to Sheppard Associates, maintained by the partnership, tax records reflected the cargo van as property of the partnership, and the cargo van was used primarily in the interest of the partnership's business. Regarding physical characteristics, the cargo van had two bucket seats in the front passenger area, possessed an open cargo area in which tapes were stored for transportation, bore the "Quick Flick" emblem on the exterior, and had no side windows on the posterior.
 
 
 3
 Swain was responsible for acquiring insurance on the partnership's automobiles, but he delegated this responsibility to one of his employees, Don Fallis, who, in turn, delegated the responsibility to Jay Sheppard. Jay Sheppard, therefore, obtained an insurance policy for one million dollars from the Great American Insurance Company (Great American), but he did not acquire umbrella coverage, nor did he acquire any additional coverage as the partnership's fleet of automobiles increased.
 
 
 4
 Jay Sheppard hired his brother Ray Sheppard (Ray Sheppard) to drive the cargo van. Although the cargo van was used primarily for partnership business, Ray Sheppard also drove the cargo van for his personal use. Tragically, on December 19, 1991, while Ray Sheppard was driving the cargo van under the influence of alcohol, he was involved in a collision that severely injured Packer and proved mortal to himself. The parties do not know where Ray Sheppard was proceeding at the time of the collision, but he was last seen at one of the partnership's videotape rental stores. At the time of the collision, the only coverage maintained by the partnership was the one million dollar commercial automobile policy written by Great American.
 
 
 5
 While Gardner, Brown, and Swain each had personal blanket umbrella policies that they acquired prior to the formation of Sheppard Associates, none of them maintained insurance coverage relating to their involvement in the partnership. Given the severity of Packer's injuries, the one million dollar policy from Great American was insufficient to cover all medical expenses; accordingly, Gardner, Brown, and Swain demanded unsuccessfully that their personal insurers provide umbrella coverage for the expenses and damages that the Great American policy was inadequate to cover. Their insurers refused, stating that there was no coverage under their personal umbrella policies for any liability arising from the Sheppard Associates' business activities.
 
 
 6
 Eventually, Swain demanded coverage under three policies issued to him: (1) a commercial automobile policy issued by Huron Insurance Company to named insured Swain d/b/a/ Swain Associates, with policy limits of one million dollars; (2) a personal automobile policy issued by Harleysville to Swain and his wife having policy limits of $300,000; and (3) as focused on in this appeal, a personal blanket excess policy issued to Swain and his wife by Harleysville, having policy limits of two million dollars. Under this personal blanket excess policy, coverage was provided for "the ownership maintenance or use of any private passenger type auto or watercraft by or on behalf of the insured," (J.A. at 302). After considering Swain's demands, Harleysville's counsel concluded that coverage did not exist and instituted a declaratory judgment action to determine the extent of coverage.
 
 
 7
 The underlying personal injury suit brought by Packer proceeded concurrently with the declaratory judgment action. Prior to trial, Packer's personal injury suit was settled. Great American paid the remaining limits of its coverage, and the umbrella insurers for Gardner and Brown, while maintaining that they were not required to do so, paid a portion of their coverage. The parties agreed to submit the issue of Swain's coverage under the three policies for resolution by the district court, which concluded that none of the three policies provided coverage.
 
 
 8
 On appeal, the Appellants abandoned their contention that Swain's commercial automobile policy and personal automobile policy provided coverage. Thus, the only issue before us is whether Swain's blanket excess policy provides coverage. Appellants raise essentially two contentions arguing that there is coverage. First, they assert that the cargo van is a "private passenger type auto" within the meaning of the policy because the cargo van was "owned, maintained, or used" on behalf of Swain. According to Appellants, implicit in this assertion is the fact that Swain owned the cargo van pursuant to N.C.G.S. Sec. 59-55(a) (Michie 1989), which provides that partners are co-owners of specific partnership property, because he was a general partner of Sheppard Associates. Second, the Appellants assert that the cargo van was a "private passenger type auto" as contemplated by the policy, or at least, the term "private passenger type auto" is ambiguous, and because insurance polices must be construed against the insurer, they are entitled to summary judgment.
 
 
 9
 Conversely, Harleysville asserts that the district court properly held that coverage was excluded. First, it posits that the cargo van was owned and maintained by Sheppard Associates, not Swain, and therefore, the policy, which was issued personally to Swain and his wife, excludes coverage because the cargo van was used to further the interests of the partnership. Second, Harleysville asserts that the term "private passenger type auto" is not ambiguous, and under North Carolina law, the cargo van does not fall within the ambit of this term.
 
 II.
 
 10
 Rule 56(c) requires that the district court enter judgment against a party who, "after adequate time for ... discovery fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). To prevail on a motion for summary judgment, Harleysville must demonstrate that: (1) there is no genuine issue as to any material fact; and (2) it is entitled to judgment as a matter of law. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). In determining whether a genuine issue of material fact has been raised, we must construe all inferences in favor of the Appellants. See id. at 257-58, 106 S.Ct. at 2514-15. If, however, "the evidence is so one-sided that one party must prevail as a matter of law," we must affirm the grant of summary judgment in that party's favor. Id. at 251-52, 106 S.Ct. at 2512. The Appellants "cannot create a genuine issue of fact through mere speculation or the building of one inference upon another," see Beale v. Hardy, 769 F.2d 213, 214 (4th Cir.1985). To survive Harleysville's motion, the Appellants may not rest on their pleadings, but must demonstrate that specific, material facts exist that give rise to a genuine issue. See Celotex Corp., 477 U.S. at 324, 106 S.Ct. at 2553. As the Anderson Court explained, the "mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff," Anderson, 477 U.S. at 244, 106 S.Ct. at 2508. Our review of a grant of summary judgment is plenary. See Cooke v. Manufactured Homes, Inc., 998 F.2d 1256, 1260 (4th Cir.1993).
 
 
 11
 The language at issue in the policy provides:
 
 
 12
 We will pay on behalf of the insured net loss in excess of the primary limit or the retained limit when no primary policy applies, because of bodily injury, personal injury or property damage to which this insurance applies, caused by an occurrence.
 
 
 13
 We will not cover any liability arising from:
 
 
 14
 ....
 
 
 15
 3. Business pursuits of any insured or property at or from which a business is conducted by any insured.
 
 This exclusion does not apply to:
 
 16
 a. activities ordinarily incidental to non-business pursuits;
 
 
 17
 b. property at or from which a business is conducted by an insured, if covered by a primary policy; or
 
 
 18
 c. the ownership maintenance or use of any private passenger type auto or watercraft by or on behalf of the insured.
 
 
 19
 (J.A. at 302). This was a personal blanket excess policy issued by Harleysville to Swain and his wife with a two million dollar limit. The insureds, therefore, under this policy were Swain and his wife, not Sheppard Associates.
 
 A.
 
 20
 The Appellants maintain that because Swain was a general partner in Sheppard Associates, he "owned, maintained, or used" the cargo van as contemplated by section 3(c). To support this contention, the Appellants rely on N.C.G.S. Sec. 59-55(a) (Michie 1989), which provides: "[a] partner is co-owner with his partners of specific partnership property holding as a tenant in partnership." According to Appellants, section 59-55(a) confers ownership upon Swain, and to meet section 3(c), Swain need only establish that his liability arises out of ownership, maintenance, or use of the cargo van by him.
 
 
 21
 In NCNB National Bank of North Carolina v. O'Neill, 102 N.C.App. 313, 401 S.E.2d 858 (1991), a creditor foreclosed on realty owned by a partnership, and subsequent to selling the realty for less than the debt, the creditor sought to collect the deficiency from the partnership and its general partners. Id., 401 S.E.2d at 859. Relying on section 45-21.36, the state anti-deficiency statute, the general partners sought to demonstrate by way of offset that the creditor's purchase price paid at foreclosure was less than fair market value. Id. The partners contended that they could invoke the anti-deficiency statute because they were "owners" of the property by virtue of their rights as tenants in partnership under section 59-55(a). Conversely, the creditor contended that only the partnership, not the partners, could invoke the anti-deficiency statute.
 
 
 22
 The Court of Appeals of North Carolina did not resolve the issue of whether the partners were "owners" of the realty, but simply concluded that they had a sufficient property interest to invoke the anti-deficiency statute. Id. at 860. While opining that section 59-55(a) made partners co-owners of partnership property by granting them a tenancy in partnership, the court observed that "[t]he incidents of this tenancy are severely limited," id. According to the O'Neill court, section 59-55(b), which limits a partner's incidents of ownership in the partnership property, appeared to eviscerate the grant of ownership conferred by section 59-55(a) to such a degree that "a partner's rights ... is at best illusory," id. This observation is in keeping with the general rule that "[u]nder a tenancy in partnership, the partnership, rather than the partners, owns the firm property, as is apparent from the [Uniform Partnership] Act's recognition that all property brought into the partnership, and property acquired with partnership funds, is partnership property," 59A Am.Jur.2d Partnership Sec. 384, at 434 (Law.Co-op.1987) (emphasis added). We cannot conclude that section 59-55(a) grants a sufficient ownership interest in Swain such that he "owns" the cargo van for purposes of the policy, and indeed, the Appellants, significantly, cite no authority for their position, other than O'Neill, the only North Carolina case construing section 59-55(a).
 
 
 23
 Apart from lacking a legal foundation for their claim, the Appellants' theory is belied by the facts. Here, the insureds under the personal blanket excess policy were Swain and his wife, neither of whom owned the cargo van; the cargo van was owned by Sheppard Associates, was purchased in Sheppard Associates' name with partnership funds, was titled to Sheppard Associates, and Sheppard Associates paid maintenance taxes on the cargo van and took depreciations on it. Additionally, the cargo van bore the emblem of "Quick Flick." Moreover, Swain did not list the cargo van as a personal vehicle in the declarations under his personal vehicle policy, nor as a commercial vehicle on the declarations of his commercial vehicle policy, nor did he pay insurance or taxes on it, nor did he drive or use it for his personal purposes. With respect to the cargo van's use at the time of the collision, the record is not clear whether Ray Sheppard was using it personally or transporting video tapes, but even if he were working, he was furthering the partnership's interest, not Swain's. In light of these facts, we cannot subscribe to the Appellants' contention that Swain "owned, maintained, or used" the cargo van simply by virtue of the fact that Swain was a general partner in Sheppard Associates.
 
 
 24
 In sum, we agree with the district court that the cargo van was not Swain's property for purposes of coverage under his personal blanket excess policy. Here, the policy the Appellants seek to enforce was a personal policy issued to Swain and his wife. Because the cargo van was owned, maintained, and used by Sheppard Associates on behalf of partnership business, the exception to the business pursuits exclusion does not apply; hence, no coverage is provided by the policy.
 
 B.
 
 25
 Next, the Appellants posit that the cargo van is a "private passenger type auto" as contemplated under section 3(c). Also, the Appellants contend that the term is ambiguous because it is not defined in the policy, and being ambiguous, it must be construed against Harleysville, the drafter of the policy. The district court rejected this contention, ruling first that the language is not ambiguous merely because it is not defined in the policy, and that the term is not ambiguous regardless, and second, that the cargo van "cannot be viewed as a passenger vehicle," (J.A. at 568). Harleysville contends that the term is not ambiguous and that the cargo van was not a private passenger type auto.
 
 
 26
 Under North Carolina law, the meaning of language used in an insurance policy is a matter of law for the court. See Wachovia Bank & Trust Co. v. Westchester Fire Ins. Co., 276 N.C. 348, 172 S.E.2d 518, 522 (1970). While ambiguous terms must be construed against the drafter, an ambiguity does not exist simply because terms are not defined in the policy. See id. If definitions are not provided, "nontechnical words are to be given a meaning consistent with the sense in which they are used in ordinary speech, unless the context clearly requires otherwise," id. The North Carolina courts have concluded that the term "private passenger type auto" or very similar terms are not ambiguous. See, e.g., Security Ins. Group of Hartford v. Parker, 289 N.C. 391, 222 S.E.2d 437, 444 (1976) (term "private passenger automobile" not ambiguous); Marshall v. Washington Nat'l Ins. Co., 246 N.C. 447, 98 S.E.2d 345, 346 (1957) (term "private passenger automobile of the pleasure type" not ambiguous); Lloyd v. Columbus Mutual Life Ins. Co., 200 N.C. 722, 158 S.E. 386, 387 (1931) (term "private automobile of the pleasure car type" not ambiguous). Thus, the Appellants are incorrect in attempting to contend that the term "private passenger type auto" is ambiguous.
 
 
 27
 The issue now becomes whether the cargo van was used in private purposes or commercial purposes and the method used to resolve this inquiry. In Commercial Insurance Co. of Newark v. Gardner, 233 F.Supp. 884, 888 (E.D.S.C.1964), the court stated that most courts use one of three methods to determine whether a vehicle is a private passenger vehicle: (1) the type of vehicle, as opposed to ownership; (2) the use to which the vehicle is put; (3) ownership of the vehicle. North Carolina law is somewhat equivocal on this point, tending to apply the type test and a hybrid of type-and-use test. In Marshall, the policy provided for payment to the beneficiary in the case of accidental death of the insured as a result of an injury while riding or driving in a "private passenger automobile of the pleasure type," Marshall, 98 S.E.2d at 346. The insured's death resulted from injuries sustained in a collision involving a GMC pickup truck, which the insured used for both business and pleasure purposes. Id. The court concluded that a truck did not come within the "natural and obvious" meaning of the language of the insuring provision of the policy, and therefore that the truck was used as a passenger vehicle for pleasure purposes was immaterial. Id. See also Parker, 222 S.E.2d at 444 ("[W]e hold that under no circumstances and notwithstanding the use to which it might be put can this kind of truck capable of hauling heavy loads of corn be a 'private passenger automobile' as that term is defined in these agreements."); Lloyd, 158 S.E. at 387 (stating that a "one and a half ton truck, used principally for hauling milk," is not a "private automobile of the pleasure car type"). Marshall, Parker, and Lloyd tend to focus on the type of vehicle for purposes of determining coverage.
 
 
 28
 Although not in the context of analyzing "private passenger type auto," but rather used to determine whether a vehicle was a "commercial vehicle," the Supreme Court of North Carolina in Kirk v. Nationwide Mutual Insurance Co., 254 N.C. 651, 119 S.E.2d 645 (1961), opined that "the test is the character of the use of the vehicle taken into consideration with the form of the car," id., 119 S.E.2d at 648 (internal quotation marks omitted), which is a hybrid type-and-use test. Similarly, in Aetna Casualty & Surety Co. v. Fields, 105 N.C.App. 563, 414 S.E.2d 69, 72 , disc. rev. denied, 331 N.C. 383, 417 S.E.2d 788 (1992), the Court of Appeals of North Carolina relied on Kirk in analyzing whether "private passenger motor vehicles" as defined in N.C.G.S. Secs. 58-40-15(9), (10) (Michie 1991), were private passenger vehicles or commercial vehicles. Kirk and Fields tend to focus on the use to which the vehicle is put, rather than the type of vehicle, for purposes of determining coverage. Under either of these tests, the cargo van at issue here was not a "private passenger type auto."
 
 1.
 
 29
 To support their position that the cargo van was a private passenger vehicle under the type test, the Appellants rely on the following: (1) the cargo van had bucket seats, a characteristic of a passenger cargo van; (2) the cargo van was equipped with "luxuries" such as AM/FM radio, automatic transmission, air conditioning, and carpeting in the front passenger area; (3) Jay Sheppard stated that the cargo van was more like a car than a truck; (4) the cargo van was classified as a private passenger vehicle on its title application, and a license tag was issued as a private passenger vehicle; (5) General Motors (GM), the manufacturer of the cargo van, classified the vehicle as a "small cargo van"; and (6) according to Appellants, under N.C.G.S. Sec. 20-4.01(27) (Michie 1993), the cargo van was a private passenger vehicle.
 
 
 30
 We do not find these facts particularly compelling. With respect to (1) and (2), we fail to perceive how these "luxuries" render the cargo van a passenger vehicle; these "luxuries" are found on commercial vehicles. Additionally, behind the seats was an open cargo area in which the videotapes were stored for transportation from one store to the other. Also, there were no side windows behind the passenger area, and the "Quick Flick" emblem was painted on the side. Regarding (3), Jay Sheppard's personal characterization of the cargo van does not render the cargo van one type or another. With respect to (4), the reason the cargo van was classified as a private passenger vehicle was because the North Carolina Department of Motor Vehicles (NCDMV) depends on the information obtained from the person registering the vehicle for licensing classification, and here, Jay Sheppard registered the cargo van, and had Sheppard informed the NCDMV that the cargo van was used for transporting videotapes, the NCDMV "would have licensed [the cargo van] as a property hauling vehicle ... instead of a passenger vehicle....," (J.A. at 552). With respect to (5), a GM engineer declared in an affidavit that the cargo van would not be classified as a passenger vehicle or a multipurpose passenger vehicle according to GM classification criteria; indeed, GM touted the cargo van as having commercial purposes and a large space for transporting goods. Regarding (6), section 20-4.01 classifies vehicles for purpose of the motor vehicles statutes, and the cargo van can best be described as fitting the property-hauling vehicle classification under section 20-4.01(31)(c). Additionally, section 20-4.01(26) provides that an "owner" is the "person holding the legal title to a vehicle...." Since Swain does not hold legal title, he cannot avail himself of this statute. Even accepting the Appellants' assertions, Marshall, Parker, and Lloyd hold that trucks, even if used for private purposes, are not "private passenger type auto[s]." The Marshall court reached this conclusion despite the fact that, as in the instant appeal, the truck was used for pleasure purposes.
 
 2.
 
 31
 The Appellants also contend that under the hybrid type-and-use test, the cargo van was used for private passenger use, relying on the following: (1) the cargo van was the only vehicle available for Ray Sheppard's use; and (2) Ray Sheppard used the cargo van for his personal use.
 
 
 32
 We agree with the district court that the cargo van was used "as a commercial cargo vehicle [and] cannot be viewed as a passenger vehicle," (J.A. at 568). One, the cargo van was purchased by the partnership with partnership funds to further the business of the partnership, namely to transport tapes from various stores. The primary use of the cargo van, therefore, was to further the interests of the partnership, i.e., a commercial use. Two, the fact that Ray Sheppard used the cargo van personally does not vitiate the fact that the cargo van was used for commercial purposes. See Parker, 222 S.E.2d at 444 ("[W]e hold that under no circumstances and notwithstanding the use to which it might be put can this kind of truck capable of hauling heavy loads of corn be a 'private passenger automobile' as that term is defined in these agreements."); Marshall, 98 S.E.2d at 346 (holding that a truck was not a "private passenger type auto," even though it was used "for pleasure purposes such as going on fishing trips and visiting relatives, and for carrying friends and relatives as passengers"). Three, recent North Carolina case law tends to support this position. In Fields, construction of the term "private passenger vehicle" was addressed as it is defined by the statute concerning stacking insurance policies. Fields, 414 S.E.2d at 71. This statute distinguishes between vehicles of the "private passenger or station wagon type" and delivery vehicles. The court concluded that for purposes of this statute, a cargo van used to transport passengers to work was not a "private passenger vehicle" because it was "commercial" in nature in that the purpose of the cargo van was to advance a business interest or further an interest in commerce. Id. at 72. We find this reasoning apt here because the purpose of the cargo van was to advance a commercial interest, i.e., transport videotapes for Sheppard Associates.*III.
 
 
 33
 We conclude that the term "private passenger type auto" is not ambiguous, and the circumstances surrounding the collision did not arise out of the ownership, maintenance, or use of the cargo van by Swain; hence, the district court properly held that his personal blanket excess policy did not provide coverage. We conclude further that the cargo van was not a "private passenger type auto" as contemplated by section 3(c) of the policy. Accordingly, the judgment of the district court is affirmed.
 
 
 34
 AFFIRMED.
 
 K.K. HALL, Circuit Judge, dissenting:
 
 35
 It would have been a simple matter for Harleysville to write a policy that unambiguously excluded coverage for accidents arising from Swain's partnership activities. Because it instead decided to use nebulous language, Harleysville should be forced to live with the consequences of that decision.
 
 I.
 
 36
 The policy excludes coverage for Swain's "business pursuits," except where liability arises from "the ownership, maintenance or use of any private passenger type auto ... by or on behalf of the insured" (emphases supplied). Coverage thus depends on the answer to two questions: "What kind of vehicle was involved in the accident?" and "For whose benefit was the vehicle owned, maintained, or being used?" I shall address each question in turn.
 
 A.
 
 37
 As the majority points out, ante at 1121-22, the North Carolina courts have construed the policy terms "private passenger automobiles," "private passenger automobiles of the pleasure type," and "private automobiles of the pleasure car type" to be unambiguous. Had Harleysville written its exception to conform to these classifications, its intent would have been more readily discerned, and the question of coverage more easily resolved.
 
 
 38
 Instead, Harleysville purported to except "private passenger type autos" from the business pursuits exclusion; we are thus compelled, the majority says, to give that term a meaning consistent with the sense that it is used in "ordinary speech." Ante at 1121-22. This is by no means a simple task. Although we may grasp with relative ease what persons mean when they speak of "private" automobiles, "passenger" automobiles, and even "private passenger" automobiles, it is more difficult to discern precisely what is meant by the term "private passenger type." It cannot be seriously argued that "passenger" and "passenger type" mean the same thing. Likewise, it is evident that the term "passenger type," which refers to the vehicle generically rather than to its actual use, is a broader designation than "passenger."
 
 
 39
 The difficulty, of course, lies in determining just how much broader. Though we might expect the policy itself to provide the answer, it does not. We are thus left with an ambiguous term that may only be more precisely defined through supposition and conjecture. Hence, if the vehicle for which coverage is sought could be said to meet the broadest reasonable definition of what Harleysville has denoted a "private passenger type auto," then the policy must be construed to provide coverage. See, e.g., Wachovia Bank & Trust Co. v. Westchester Fire Ins. Co., 276 N.C. 348, 172 S.E.2d 518, 522 (1970) ("The words used in the policy having been selected by the insurance company, any ambiguity or uncertainty as to their meaning must be resolved in favor of the policyholder ... and against the company."); Kunin v. Benefit Trust Life Ins. Co., 910 F.2d 534, 540 (9th Cir.) (in light of the expertise and experience possessed by drafters of insurance policies, the rule of contra proferentum applies in all fifty states and the District of Columbia to construe all ambiguities in favor of the insured), cert. denied, 498 U.S. 1013, 111 S.Ct. 581, 112 L.Ed.2d 587 (1990).
 
 
 40
 Ascribing to the term "passenger type" a meaning consistent with that used in ordinary speech, I conclude that a "private passenger type auto" is a private-use automobile capable of transporting passengers, or at least one that is regularly used to do so.* The uncontradicted evidence in the instant case is that Ray Sheppard often used the Astro van to transport at least one passenger--himself--to and from personal errands. Because the van was regularly used as a private passenger vehicle, it easily fits within the broadest reasonable definition of "private passenger type auto."
 
 B.
 
 41
 The policy exception requires the "passenger type auto" to be "owne[d], maintain[ed], or use[d] ... by or on behalf of the insured." N.C.Gen.Stat. Sec. 59-55(a) states in black and white that "[a] partner is co-owner with his partners of specific partnership property holding as a tenant in partnership" (emphasis supplied). The language of the statute compels but one conclusion: Swain owned, with his partners, the Astro van.
 
 
 42
 The majority relies on NCNB Nat'l Bank v. O'Neill, 102 N.C.App. 313, 401 S.E.2d 858 (1991), to support its contention that Section 59-55(a) does not mean what it says. See ante at 1120-21. In O'Neill, a mortgagee foreclosed on partnership property, purchased the property for an amount less than the outstanding debt, then brought suit for the deficiency against the individual partners. The question before the North Carolina Court of Appeals was whether the partners (as opposed to the partnership) had standing to invoke a statutory defense available only to persons holding a property interest in the mortgaged property--that the mortgagee purchased the property for less than fair market value.
 
 
 43
 Along the way, the O'Neill court merely stated the obvious--that the tenancy created by Section 59-55(a) does not confer the full incidents of ownership on each individual partner. See id., 401 S.E.2d at 860. Although the court noted its general agreement with some commentators who believed the individual tenants' ownership interest to be "at best illusory," id., it held that the partners' interest in the mortgaged property was not so "illusory" as to preclude them from asserting the statutory defense. Because I give more credence to what courts do than what they say, I surmise that the only illusion at work in the instant case is the sense of comfort that the majority derives from O'Neill.
 
 
 44
 Moreover, and perhaps more importantly, the majority ignores the plain language of the policy exception. The terms of the exception do not require Swain to have owned the van; the language merely dictates, at a minimum, that the van be owned or used on his behalf--in other words, for Swain's "[i]nterest, support, or benefit." Webster's II New Riverside University Dictionary (1988).
 
 
 45
 The van was purchased to facilitate the partnership business and increase its profitability. It is, of course, obvious that any increase in the partnership's profits benefited Swain by enhancing the return on his investment. That the partnership van was being operated for Swain's benefit and in his interest--and therefore owned or used on his behalf--could not be more clear.II.
 
 
 46
 I would hold that coverage exists under the blanket excess policy. Because the majority has arrived at the opposite conclusion, I respectfully dissent.
 
 
 
 *
 Although interwoven with their other arguments, the Appellants argue that the district court erred in not consulting the North Carolina motor vehicle statutes in determining the meaning of "private passenger type auto." Our review of North Carolina law, however, leads us to conclude that these statutes are only a factor that the courts use to determine the meaning of the term. Also, some decisions do not resort to the statute to reach their holdings. See Parker, 222 S.E.2d at 444; Marshall, 98 S.E.2d at 346. Regardless, as stated above, we conclude the cargo van was more properly classified as a property-hauling vehicle, rather than a private passenger vehicle
 
 
 *
 Thus, a taxicab would not be a "private passenger type auto" if ordinarily used for commercial, and not private, purposes. A bus would likewise be disqualified for the same reason, and, perhaps, because no reasonable person would understand it to be an "auto." A tractor-trailer rig, though possibly used for private purposes and conceivably--albeit perhaps barely--an "auto," would not be an auto of the "passenger type" because it is impractical to use such a vehicle to regularly transport passengers only; it would be more properly designated a "freight" or "cargo" vehicle
 The van at issue here was, unlike a tractor-trailer, obviously capable of regularly transporting passengers. Although it was often used to haul freight or cargo, that fact alone hardly compels the conclusion that it was not a "private passenger type auto," because it was also used quite often for private purposes. It bears repeating that, to the extent that we struggle to define the term "private passenger type auto," the difficulty is directly attributable to Harleysville's failure to provide any parameters.