Frank MORDESOVITCH, Plaintiff,

v.

**WESTFIELD INSURANCE COMPANY, Defendant.**

No. CIV.A. 2:02–0078.

United States District Court,
S.D. West Virginia,
Charleston Division.

April 23, 2003.

Christopher J. Heavens, Heavens Law Offices, John Einreinhofer, Charleston, WV, for Plaintiff.

Tanya M. Kesner, Brent K. Kesner, Kesner, Kesner & Bramble, Charleston, WV, for Defendant.

## MEMORANDUM OPINION AND ORDER

HADEN, District Judge.

Pending is Defendant's motion for summary judgment. The Court GRANTS the motion.

## I. FACTUAL BACKGROUND

Plaintiff Frank Mordesovitch (Mordesovitch) is a resident of Berkeley County, West Virginia. Defendant Westfield Insurance Company is an Ohio corporation that entered into a contract with Mordesovitch to provide underinsured motorist coverage. Defendant Eric Sikorski, an adjustor for Westfield, is a Kentucky resident who was involved in the adjusting process of the subject claim.

On June 4, 1999 Mordesovitch's son Charles was struck and killed by a vehicle operated by Carrine Smith. Mordesovitch was appointed administrator of his son's estate. On January 11, 2000 he instituted a wrongful death action in the Circuit Court of Berkeley County against West-

field, Smith, and the Tunnel Club, a bar that served alcohol to Smith prior to the accident.

Smith had coverage with a $50,000.00 liability limit which was paid to the estate. Westfield waived its subrogation rights as to Smith. Following an eight-month defense of the case, Westfield also paid Mordesovitch's $300,000.00 underinsured motorist limits to the estate. Westfield requested Mordesovitch, however, to execute a subrogation agreement permitting recoupment by Westfield on any Tunnel Club settlement. Counsel for Mordesovitch asserts he informed Westfield it only had subrogation rights against an under-insured motorist, which it had waived, and not against the nonmotorist Tunnel Club. Counsel for Westfield disagreed.

Despite the asserted disagreement, Mordesovitch agreed to the following term in the "RELEASE, SETTLEMENT, AND SUBROGATION" agreement:

> This Agreement, however, shall not preclude the Claimant from proceeding against other individuals or entities believed to be responsible, in whole or in part, for injuries and/or damages caused by the accident of June 4, 1999. *Westfield shall be subrogated to the extent of its payment of underinsurance and medical payments to the Petitioner, except that Westfield has waived its subrogation rights against Carrine A. Smith. Also, Westfield's rights of subrogation shall be subject to West Virginia law and the Westfield policy of insurance.*

(Ex. A, Defs.' Mot. Summ. J. at 4 (emphasis added).)

Mordesovitch's counsel's comments at a hearing before the circuit court seem to belie any disagreement on the right of Westfield to subrogate against the Tunnel Club:

> While Westfield has waived its right of subrogation as to Carrine Smith, Westfield *maintains its right* to subrogation against the other Defendant, The Tunnel Club, or any other.

> .    .    .    .    .

> Let me make one thing clear because me and Mr. Kesner went back and forth over this. *They do have a right of subrogation against The Tunnel Club, we understand that,* but I want the record to be clear, just in case this ever comes up later, if ultimately a judgment is obtained against The Tunnel Club, it would be in excess of the offset which is $350,000, it will be our position, I have told Mr. Kesner this in writing, it would be our position, the made whole rule governs any subrogation Westfield would have.... Just to make the record clear, *we do understand they have a subrogation right, however, we believe it is subject to the made whole rule under West Virginia law ....*

(Ex. B, Defs.' Mot. Summ. J. at 2–3.)[1]

1. The made-whole rule was most recently described in *Anderson v. Wood*, 204 W.Va. 558, 562, 514 S.E.2d 408, 412 n. 7 (1999):

   "The made-whole rule has been interpreted in insurance cases to mean that '[u]nder general principles of equity, in the absence of statutory law or valid contractual obligations to the contrary, an insured must be fully compensated for injuries or losses sustained (made whole) before the subrogation rights of an insurance carrier arise.'"

   *Id.* (quoted authority omitted).

Perhaps in attempted explanation of his comments at the hearing, Mr. Heavens asserts in the Complaint:

> In order to receive payment of underinsured funds from Westfield and its legal agents and in an attempt to cut-off the delay tactics of Westfield in their refusal to pay the ... limit, the plaintiff requested that Westfield include language in its release document which stated that Westfield's subrogation right, if any, would be "subject to West Virginia law," knowing that, if the plaintiff later recovered compensation from the bar and/or its insurance company that

Mordesovitch's counsel later settled the estate's claim against the Tunnel Club and informed defense counsel of the outcome. Mordesovitch's counsel requested Westfield to waive its subrogation rights and requested a response within five (5) days. A month later, after oral discussions between counsel, defense counsel requested discovery information on damages to the estate for purposes of determining applicability of the made-whole rule.

Mordesovitch's counsel, at a cost of $3,500.00, provided Westfield an economist's report regarding future lost wages. Counsel also provided an expert evaluation from attorney William E. Watson, opining the case had a value of one million dollars. After studying the matter for a few business days, Westfield waived subrogation against the Tunnel Club. Sometime prior to this, however, defense counsel informed counsel for the Tunnel Club's insurer that any settlement proceeds check should include Westfield as a payee. That request was presumably withdrawn following Westfield's waiver.

A short time later, Mordesovitch instituted this action in the Circuit Court of Kanawha County. Both counts of the Complaint appear to seek relief under the West Virginia Unfair Trade Practices Act and *Hayseeds, Inc. v. State Farm Fire & Casualty,* 177 W.Va. 323, 352 S.E.2d 73

(1986). In Count One, Mordesovitch alleges numerous bad acts by Westfield, namely that it (1) delayed the subrogation waiver against the uninsured motorist; (2) delayed settlement of the estate's underinsured motorist claim against Westfield, (3) "extort[ed]" a subrogation agreement from the estate relating to the Tunnel Club, (4) unlawfully sought subrogation against the non-motorist Tunnel Club, (5) delayed settlement with the Tunnel Club based on its unlawful subrogation demand, (6) requested the Tunnel Club's insurer to add Westfield as a payee on the settlement check, (7) refused to answer the estate's phone calls or letters, and (8) misrepresented facts to the circuit court regarding the status of, and Westfield's role, in the proceedings.

Count Two is based upon Sikorski's alleged "numerous disparaging statements about the decedent and ... [his] family, including the value of the decedent's life[.]" (Compl.¶ 41.) It is important to note, however, Sikorski was dismissed as a party after Mordesovitch failed to make service, despite being given a substantial period of time in which to do so.

Westfield removed and the parties engaged in a very contentious discovery period. Westfield now seeks summary judgment.

Westfield would have no right under West Virginia law to receive subrogation. (Compl.¶ 16.) Despite this assertion, the hearing transcript can be viewed two ways, neither of which are particularly helpful to Plaintiff. Viewed from one angle, Plaintiff voluntarily conceded the primary question in this case, namely Westfield's right of subrogation against the Tunnel Club, limited only by the made-whole rule. Viewed another way, Plaintiff conceded that point only as subterfuge, misleading the circuit court in the process, to expedite recovery of the policy limits from Westfield, only later to sue it for bad faith. If that is what actually occurred, and

the subject matter of this dispute was factual, rather than legal, in nature, the doctrine of judicial estoppel might warrant outright dismissal. *See Lowery v. Stovall,* 92 F.3d 219, 224 (4th Cir.1996) (stating "First, the party sought to be estopped must be seeking to adopt a position that is inconsistent with a stance taken in prior litigation. And the position sought to be estopped must be one of fact rather than law or legal theory. Second, the prior inconsistent position must have been accepted by the court. ... Finally, the party sought to be estopped must have 'intentionally misled the court to gain unfair advantage.' ").

## II. DISCUSSION

### A. *Summary Judgment Standard*

Our Court of Appeals has often stated the settled standard and shifting burdens governing the disposition of a motion for summary judgment:

Rule 56(c) requires that the district court enter judgment against a party who, "after adequate time for ... discovery fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," To prevail on a motion for summary judgment, the [movant] must demonstrate that: (1) there is no genuine issue as to any material fact; and (2) it is entitled to judgment as a matter of law. In determining whether a genuine issue of material fact has been raised, we must construe all inferences in favor of the [the nonmovant]. If, however, "the evidence is so one-sided that one party must prevail as a matter of law," we must affirm the grant of summary judgment in that party's favor. The [nonmovant] "cannot create a genuine issue of fact through mere speculation or the building of one inference upon another," To survive [the motion], the [nonmovant] may not rest on [his] pleadings, but must demonstrate that specific, material facts exist that give rise to a genuine issue. As the *Anderson* Court explained, the "mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff[.]"

*Harleysville Mut. Ins. Co. v. Packer*, 60 F.3d 1116, 1119–20 (4th Cir.1995) (citations omitted); *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir.), *cert. denied*, 513 U.S. 813, 115 S.Ct. 67, 68, 130 L.Ed.2d 24 (1994); *see also Cabro Foods, Inc. v. Wells Fargo Armored Service Corp.*, 962 F.Supp. 75, 77 (S.D.W.Va.1997); *Spradling v. Blackburn*, 919 F.Supp. 969, 974 (S.D.W.Va.1996).

"At bottom, the district court must determine whether the party opposing the motion for summary judgment has presented genuinely disputed facts which remain to be tried. If not, the district court may resolve the legal questions between the parties as a matter of law and enter judgment accordingly." *Thompson Everett, Inc. v. National Cable Advertising, L.P.*, 57 F.3d 1317, 1323 (4th Cir.1995).

### B. *Count One*

■ Despite the numerous allegations in Count One, the parties' dispute crystallizes around one issue: does Westfield have a right of subrogation against settlement proceeds from a non-motorist under either the parties' contract or the West Virginia statute governing underinsured motorist coverage? From a global perspective, one commentator has observed:

As a general rule, the insurer's full payment of a claim owing to the insured under a policy entitles the insurer to be immediately subrogated to its insured's rights and remedies against the party primarily liable for the loss to which the insured's claim relates.

Lee R. Russ *et al.*, 16 *Couch on Insurance* § 223:16 (3rd. ed.2003). The same commentator further notes:

The parties against whom an uninsured or underinsured motorist insurer is entitled to seek subrogation *depend largely on the terms of the relevant statute, any subrogation or reimbursement clause in the policy, and the jurisdiction's public policy concerns .... There are many other entities against whom the insured may have a claim, however, and the right of the insurer to subrogation against these entities varies depending on the statutes, public policy, policy*

*terms, and the status of the potential defendant.*

*Id.* § 225:17.[2]

Turning first to the policy, the issue presented here is addressed under the "General Provisions" at Part F:

**OUR RIGHT TO RECOVER PAYMENT**

A. If we make a payment under this policy and the person to or for whom payment was made has a right to recover damages from another we shall be subrogated to that right. That person shall do:

  1. Whatever is necessary to enable us to exercise our rights; and

  2. Nothing after loss to prejudice them.

B. If we make a payment under this policy and the person to or for whom payment is made recovers damages from another, that person shall:

  1. Hold in trust for us the proceeds of the recovery; and

  2. Reimburse us to the extent of our payment.

(Ct. Ordered Supp. at 12.) The language explicitly and unambiguously accords Westfield the right of subrogation/reimbursement at issue presently.

The next question is whether the Legislature has spoken to the issue of subrogation vis-a-vis nonmotorist tortfeasors in the context of an underinsured coverage claim. A helpful starting point is *West Virginia Code* Section 33–6–31(b):

(b) Nor shall any such policy or contract be so issued or delivered unless it shall contain an endorsement or provisions undertaking to pay the insured all sums which he shall be legally entitled to recover as damages from the owner or operator of an uninsured motor vehicle, within limits which shall be no less than the requirements of section two, article four, chapter seventeen-d of this code, as amended from time to time: Provided, That such policy or contract shall provide an option to the insured with appropriately adjusted premiums to pay the insured all sums which he shall be legally entitled to recover as damages from the owner or operator of an uninsured motor vehicle up to an amount of one hundred thousand dollars because of bodily injury to or death of one person in any one accident and, subject to said limit for one person, in the amount of three hundred thousand dollars because of bodily injury to or death of two or more persons in any one accident and in the amount of fifty thousand dollars because of injury to or destruction of prop-

---

**2.** There is conflicting, nonbinding authority on the issue presented in this case. *Compare, e.g.,* Daniel D. Blinka & Thomas J. Hammer, *Court of Appeals Digest,* Wisconsin Lawyer (1996) (quoting *Hull v. Heritage Mut. Ins. Co.,* 203 Wis.2d 547, 553 N.W.2d 295 (1996)), *with Grain Dealers Mut. Ins. Co. v. Wuethrich,* 716 N.E.2d 596 (Ind.Ct.App.1999) (discussing set-off). The Court agrees, however, with the observation of the Supreme Court of Iowa:

There is a dearth of authority on whether dramshop recoveries, in common with recoveries against underinsured motorist, should be deducted from underinsurance policy limits. *Bauter v. Hanover Ins. Co.,* 247 N.J.Super. 94, 101, 588 A.2d 870, 874–

75 (1991), *cert. denied,* 126 N.J. 335, 598 A.2d 893 (1991), cites a case for each view, and opts for also deducting the dramshop recovery. *The question is said to turn on the basic approach taken in the jurisdiction toward underinsurance provisions.*

*Zurn v. State Farm Mut. Auto. Ins. Co.,* 482 N.W.2d 923 (Iowa 1992). Rather than opting for an unprincipled choice between a minority or majority approach, the Court believes it more consistent with its obligations under *Erie R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), to carefully review the governing policy and West Virginia statute and make its decision accordingly.

erty of others in any one accident: Provided, however, That such endorsement or provisions may exclude the first three hundred dollars of property damage resulting from the negligence of an uninsured motorist: Provided further, That such policy or contract shall provide an option to the insured with appropriately adjusted premiums to pay the insured all sums which he shall legally be entitled to recover as damages from the owner or operator of an uninsured or underinsured motor vehicle up to an amount not less than limits of bodily injury liability insurance and property damage liability insurance purchased by the insured without setoff against the insured's policy or any other policy. . . .

W. Va.Code § 33–6–31(b).

*West Virginia Code* § 33–6–31(f) specifically governs subrogation in this setting:

(f) An insurer *paying a claim under the endorsement or provisions required by subsection (b)* of this section shall be subrogated to the rights of the insured to whom such claim was paid *against the person causing such injury, death or damage to the extent that payment was made.* The bringing of an action against the unknown owner or operator as John Doe or the conclusion of such an action shall not constitute a bar to the insured, if the identity of the owner or operator who caused the injury or damages complained of, becomes known, from bringing an action against the owner or operator theretofore proceeded against as John Doe. Any recovery against such owner or operator shall be paid to the insurance company to the extent that such insurance company shall have paid the insured in the action brought against such owner or operator as John Doe, except that such insurance company shall pay its proportionate part of any reasonable costs and expenses incurred in connection therewith, including reasonable attorney's fees. Nothing in an endorsement or provision made under this subsection, nor any other provision of law, shall operate to prevent the joining, in an action against John Doe, of the owner or operator of the motor vehicle causing injury as a party defendant, and such joinder is hereby specifically authorized.

W. Va.Code § 33–6–31(f) (emphasis added). One is struck immediately by the Legislature's use of the word "person." The operative question is whether the term "person" should be broadly understood to include non-motorist tortfeasors. The Court believes the Legislature answered that question in the affirmative long ago.

■ *West Virginia Code* Section 33–1–3 contains the definition of the term "person" as expressed in the West Virginia Insurance Code. That statute provides:

Person includes an individual, company, insurer, association, organization, society, reciprocal, partnership, syndicate, business trust, corporation or any other legal entity.

*Id.* One could not imagine a more expansive definition of the term "person." Of greater significance is that this definition predates the enactment of Section 33–6–31(f).

If this explicit legislative enactment leaves any doubt, one can gain further insight into whether the Legislature intended the broadest possible meaning of "person" in Section 33–6–31(f). In Section 33–6–31(b), the Legislature refers to "the owner or operator of an uninsured or underinsured motor vehicle" and "uninsured motorist." The phrase "owner or operator of an uninsured or underinsured motor vehicle" is likewise used in subsection 33–6–31(d). This indicates the Legislature did not equate these terms with the word "person" as used in subsection 33–6–31(f).

Rather, one might posit the former are merely subsets of the latter.

Another subsection better illustrates the point:

> (j) A motor vehicle shall be deemed to be uninsured within the meaning of this section, if there has been a valid bodily injury or property damage liability policy issued upon such vehicle, but which policy is uncollectible, in whole or in part, by reason of the insurance company issuing such policy upon such vehicle being insolvent or having been placed in receivership. The right of subrogation granted insurers under the provisions of subsection (f) of this section shall not apply as against *any person or persons who is or becomes an uninsured motorist for the reasons set forth in this subsection.*

W. Va.Code § 33–6–31(j) (emphasis added). If the term "person" were deemed coextensive only with uninsured or underinsured motorists, the Legislature would have written the underscored portion to read "one becoming an uninsured motorist for the reasons[,]" leaving out the words "person or persons." Instead, it appears the Legislature went to great pains to demonstrate uninsured motorists, and presumably underinsured motorists, were simply one subset of those entities considered "person[s]" within the meaning of subsection 33–6–31(f).

Finally, subsection 33–6–31(i) provides:

> The commissioner of insurance shall formulate and require the use of standard policy provisions for the insurance required by this section, but use of such standard policy provisions may be waived by the commissioner in the cir-

cumstances set forth in section ten of this article.

*Id.*

The views of the Insurance Commissioner during the subject time period, then, are material to the interpretive effort and legislative intent. It is interesting to consider a May 1975 Informational Letter from the Commissioner regarding standard policy provisions for uninsured motorists coverage [3]:

> Any amount payable hereunder because of bodily injury or property damage sustained in an accident by a person who is an insured under this coverage shall be reduced by all sums paid on account of such injury or damage by or on behalf of:
>
> (I) The owner or operator of the uninsured motor vehicle; and
>
> (II) *Any other person or persons jointly or severally liable together with such owner or operator for such injury or damage* including all sums paid under the Bodily Injury Liability or Property Damage Liability coverages of the policy.

Inform. Letter ¶ IV.E.4 (emphasis added.) This provision requires a reduction or offset of uninsured motorist coverage not only for the amounts paid by the uninsured motorist, but also "any other person ... jointly or severally liable together with such owner or operator for such injury or damage." *Id.* This demonstrates two things. First, it provides substantial support for the proposition the Commissioner considered payments made by nonmotorist tortfeasors would properly reduce the amount of uninsured motorist benefits payable to the insured. Second, it makes clear the Commissioner's understanding the term "person" and the phrase "owner

---

**3.** The first sentence of Section 33–6–31(f) has not been amended since its original enactment in 1967.

or operator of the uninsured [or underinsured] motor vehicle" are distinct and have separate meanings. This is significant. *Appalachian Power v. Tax Dept.*, 195 W.Va. 573, 582, 466 S.E.2d 424, 433 (1995) ("An inquiring court—even a court empowered to conduct de novo review—must examine a regulatory interpretation of a statute by standards that include appropriate deference to agency expertise and discretion.")

Based on the foregoing, the Court concludes a right of subrogation exists under subsection 33–6–31(f) against both the underinsured motorist and any other nonmotorist tortfeasor "causing such injury, death or damage to the extent payment was made." Although the Supreme Court

of Appeals has never spoken directly on the issue, this approach is consistent with the West Virginia Court's general statements about the reach of subsection 33–6–31(f). *See, e.g., Anderson v. Wood*, 204 W.Va. 558, 563, 514 S.E.2d 408, 413 (1999)("Our research reveals that, under W. Va.Code § 33–6–31(f) (1998) (Supp. 1998), the Legislature has authorized insurers providing uninsured motorist coverage to be *subrogated for payments made to an insured*.") (emphasis added).

Westfield thus acted appropriately in attempting to protect its subrogation rights. Accordingly, those actions cannot form the basis for either a statutory or common law bad faith claim.[4] According-

**4.** This conclusion effectively negates the third, fourth, fifth and sixth bases discussed *infra* in support of Mordesovitch's statutory and common law bad faith claims. That leaves four allegations against Westfield in support of the allegations in Count One. First, Mordesovitch asserts Westfield delayed waiver of its subrogation rights against the uninsured motorist. Mordesovitch, however, has failed to develop this issue in his response memorandum disclosing when the waiver was requested and ultimately granted. The failure to come forward with proof on this issue compels a finding as a matter of law that no unreasonable delay occurred, as asserted by Westfield. Second, Mordesovitch asserts Westfield delayed settlement of the estate's underinsured motorist claim against Westfield. Only seven (7) months elapsed, however, between the time the action was filed and Westfield's settlement of the claim. The response memorandum concedes as well that Westfield reserved its rights on the underinsured claim "because of a residency question over the plaintiff's deceased son." (Resp. Memo. at 2.) Further, Mordesovitch does not otherwise complain about this seemingly reasonable time interval in his response memorandum. Third, the Complaint asserts Westfield (1) misrepresented facts to the circuit court regarding the status of, and Westfield's role, in the proceedings, and (2) refused to answer the estate's phone calls or letters. Once again, however, these assertions are neither illuminated nor pursued in the response memorandum in any depth. Lacking any ba-

sis upon which to find a genuine and material issue of fact, Westfield is entitled to judgment as a matter of law on these two allegations. Fourth, to the extent Mordesovitch complains about Westfield unreasonably delaying the Tunnel Club settlement due to the controversy about the made-whole rule, the Court concludes the allegation is insufficient as a matter of law. Stripped of its rhetoric, the argument is that Westfield acted improperly by requesting an economic report from Mordesovitch because it already had discovery material on the deceased's wages and other financial information. It is undisputed, however, that "once Westfield settled the plaintiff's underinsured claim on or about June 14, 2000, Westfield was no longer involved in the underlying tort suit." (Resp. Memo. at 15.) This leaves a period of several months in which Westfield was not involved in the case. It was reasonable as a matter of law for it then to request current information regarding whether the deceased was in fact made whole by the proposed settlement and prior payments. Further, after receiving the brief report, Westfield waived subrogation within just a few business days.

One additional argument from Mordesovitch requires brief comment. He asserts subrogation rights can only arise under the policy and the statute as a result of underinsured benefits lawfully being paid out. He asserts none were required to be paid out under these circumstances because the Tunnel Club was not an owner or operator of an underin-

ly, the Court **GRANTS** Westfield's motion for summary judgment on Count One.

### C.  Count Two

It appears Mordesovitch has abandoned this claim, as no discussion of it appears in the response memorandum. The Court also notes the alleged perpetrator, Mr. Sikorski, is no longer a party to this action. Absent any mention of the claim by Plaintiff, the Court **GRANTS** Westfield's motion for summary judgment on Count Two.

The Clerk is directed to send a copy of this Memorandum Opinion and Order to counsel of record and to post a copy on the Court's website at www.wvsd.uscourts.gov.

### JUDGMENT ORDER

In accordance with the Memorandum Opinion and Order entered today, the Court ORDERS as follows:

1. Defendant's motion for summary judgment is GRANTED; and

2. This action is DISMISSED and STRICKEN from the docket.

The Clerk is directed to send a copy of this Judgment Order to counsel of record.

sured vehicle as required by the policy and the statute. The answer to this argument, of course, is that whether proceeds were correctly or incorrectly paid, once paid the right of subrogation clearly arises under both the policy and the statute.