# United States Court of Appeals
## For the First Circuit

No. 99-1449

JULIANNE TOMPKINS, KATHLEEN TOMPKINS, and JOHN TOMPKINS,

Plaintiffs, Appellants,

v.

UNITED HEALTHCARE OF NEW ENGLAND, INC.,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Joseph L. Tauro, U.S. District Judge]

Before

Stahl, Circuit Judge,
Bownes, Senior Circuit Judge,
and Lipez, Circuit Judge.

John R. Mitchell for appellants.

Joan O. Vorster, with whom Mirick, O'Connell, DeMallie & Lougee, LLP, was on brief, for appellee.

February 11, 2000

**LIPEZ**, **Circuit Judge**.    The plaintiffs, Julianne, Kathleen, and John Tompkins, appeal from the district court's dismissal, pursuant to Fed. R. Civ. P. 12(b)(6), of their claims against United Healthcare of New England, Inc. ("United"), alleging violations of federal and state anti-discrimination statutes, as well as negligent and intentional infliction of emotional distress, misrepresentation, and breach of written, oral, and implied contracts.  The district court found that the Employee Retirement Income Security Act of 1974 ("ERISA") as amended, 29 U.S.C. § 1001 et. seq., preempted the state statutory and common law claims of the plaintiffs and that their claims under the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101-12213, failed to state a cause of action.  For reasons somewhat different than those relied upon by the district court, we affirm.

## I. BACKGROUND

John and Kathleen Tompkins have a daughter, Julianne Tompkins, who suffers from Trisomy 13, a chromosomal disease that requires regular medical treatment.  From 1993 to 1996, Julianne received her treatment at the New England Medical Center ("NEMC").

United is the Tompkinses' health care insurer.  Between 1993 and 1996, United pre-approved and paid for Julianne's treatment at NEMC.  During that time the Tompkinses received their insurance through Mr. Tompkins's employer, A.B. Dick.  In 1996, Mrs. Tompkins returned to work and her employer, New Bedford Harbor Services, Inc. ("New Bedford"), offered her a United insurance

-2-

policy with lower premiums. After emphasizing the importance of Julianne's continued treatment and receiving assurances from United representatives that changing employer-providers would not alter their coverage, the Tompkinses switched and obtained their insurance through New Bedford.

Less than a week after the switch, however, United began to deny payments for treatment provided to Julianne at NEMC. Shortly thereafter, United notified the Tompkinses that Julianne's therapies at NEMC would no longer be pre-approved or paid for because Julianne was being "transitioned"--i.e., she was to receive future treatment by United-covered physicians at less costly hospitals closer to her home. In the Tompkinses' view, such "transition" meant that Julianne would be unable to visit her regular physicians or to benefit from the high level of expertise and quality available at NEMC.

The Tompkinses appealed United's denial of coverage at NEMC and its decision to transition Julianne to other hospitals for treatment. Ultimately, United's Member Relations Committee heard the appeal and reversed the earlier benefit denial, agreeing to pay back-costs for treatment already received and authorizing Julianne to obtain her future treatments at NEMC.

Despite that victory the Tompkinses initiated this lawsuit, alleging that they suffered emotional distress and physical ailments, and incurred costs and expenses including attorneys' fees, as a result of "their efforts to reverse United's discriminatory denial of Julianne's benefits." In Counts I - IV of

the complaint, the Tompkinses sought to recover under Titles I and III of the ADA, the Massachusetts discrimination statute, Mass. Gen. Laws. ch. 151B, and the Massachusetts Equal Rights Act Mass. Gen. Laws. ch. 93 § 103.  In Counts V - X, the Tompkinses alleged various common law causes of action, including intentional infliction of emotional distress, misrepresentation, and breach of written, oral, and implied contracts.

United moved to dismiss the Tompkinses' claims on the grounds that, inter alia, (1) ERISA preempted the state statutory and common law claims, and (2) the ADA claims failed to state a cause of action.  The district court agreed on both grounds. First, the court held that the Tompkinses' state statutory and common law claims "related to" United's ERISA-regulated health insurance plan within the meaning of ERISA's preemption clause,[1] and consequently, that ERISA preempted all of the Tompkinses' state law claims.  Second, the court ruled that the Tompkinses did not state an ADA Title I claim because the allegations of the complaint did not show that United was a "covered entity" under Title I. Lastly, the court concluded that because "Plaintiffs cannot point to any services which United has denied them, they fail to state a claim under Title III."

In affirming the dismissal of the Tompkinses' claims, we rely on somewhat different reasoning than the court below because

---

[1]ERISA's preemption clause, ERISA § 514(a), 29 U.S.C. § 1144(a), provides: "Except as provided in subsection (b) of this section, the provisions of this subchapter . . . shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan. . . ." (emphasis added).

of the interrelationship between the ADA claims of the plaintiffs and ERISA preemption.  On appeal, the plaintiffs do not argue, as they did below, that their state-law claims do not "relate to" the United health care plan within the meaning of ERISA's preemption clause.  Instead, relying on the viability of their ADA claims, the Tompkinses assert an alternative argument that they made below-- namely, that their Massachusetts statutory claims are exempt from ERISA preemption as a necessary adjunct to the ADA's enforcement scheme.[2]

We reject the premise of the argument by concluding that both the Title I and the Title III ADA claims were properly dismissed.  The only discriminatory conduct alleged in the complaint--United's initial decision to deny payment for Julianne's treatment at NEMC--was fully redressed through United's ERISA-mandated internal review process.  Likewise, we find no merit to the contention of the plaintiffs that United waived its right to assert ERISA preemption as an affirmative defense.

## II.  THE ADA CLAIMS

We review de novo a Rule 12(b)(6) dismissal.  See Beddall v. State St. Bank & Trust Co., 137 F.3d 12, 16 (1st Cir. 1998).  In reviewing a judgment entered under Rule 12(b)(6), we must take the

---

[2]Although the district court did not address the interrelationship between the ADA claims and ERISA preemption, the court's conclusion that there were no viable ADA claims had the effect of deciding the preemption issue on the basis we set forth here.

factual allegations of the complaint as true and draw every reasonable inference in favor of letting the lawsuit proceed. See Langadinos v. American Airlines, Inc., No. 99-1120, 2000 WL 1998, at *1 (1st Cir. Jan. 6, 2000). The complaint will survive as long as it pleads sufficient facts to warrant recovery on any cognizable theory of the case. See Garita Hotel Ltd. Partnership v. Ponce Fed. Bank, F.S.B., 958 F.2d 15, 17 (1st Cir. 1992).

To recover under either Title I or Title III of the ADA, the aggrieved party must be able to show that he or she was denied some benefit on account of a disability or an association with a disabled person. Title I of the ADA provides in relevant part:

> No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112(a). Title III of the ADA provides in relevant part:

> No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation.

42 U.S.C. § 12182(a).

Our review of a benefit decision made pursuant to an ERISA-regulated employee benefit plan "must focus . . . on the determinations of the final decision-maker." Terry v. Bayer Corp., 145 F.3d 28, 35-36 (1st Cir. 1998) (emphasizing that "a

-6-

prerequisite to obtaining judicial review . . . is that the claimant have exhausted the internal administrative remedies available to him."). In the case at hand, the Tompkinses recovered the benefits that they claimed were wrongfully denied on the basis of discrimination by utilizing the internal administrative remedies available to them. In reversing United's initial decision to deny the benefits, United's Member Relations Committee ordered payments of back-costs for treatment already received and authorized Julianne to receive her future treatments at NEMC. Accordingly, the Tompkinses were not denied any "terms, conditions, [or] privileges of employment" under Title I or any "services" under Title III attributable to United's initial decision to deny Julianne benefits based on her disability.[3]

A close examination of the complaint reveals that the only discriminatory conduct alleged by the Tompkinses was United's <u>initial</u> decision to refuse payments for Julianne's treatment at NEMC. In the count of the complaint asserting a cause of action under Title I, the Tompkinses allege in relevant part:

> 54. Defendant's establishment of a health
> benefit plan, which wrongfully discriminates
> against persons with Trisomy 13 and in
> particular Julianne Tompkins, and the
> Plaintiffs constitutes a violation of ADA.
>
> . . . .

---

[3]Although neither Mr. Tompkins nor Mrs. Tompkins are disabled, they argue that United discriminated against them because of their association with Julianne. Given our conclusion that there was no denial of benefits, we need not address the validity of the association discrimination claims, or whether Mr. Tompkins or Mrs. Tompkins are "qualified individuals" under the ADA, or whether United is a "covered entity" under the ADA.

-7-

> 56. As a direct and proximate result of these violations of the ADA by Defendant, Plaintiffs have lost and will continue to lose benefits of their employment and contractual relationship with the Defendant.
>
> 57. As a direct and proximate result of these violations of the ADA by Defendant, Plaintiffs have experienced and will continue to experience emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses.

The conduct alleged to violate the ADA is the "establishment of a health benefit plan, which wrongfully discriminates against persons with Trisomy 13." As a result, the Tomkinses assert that they "lost and will continue to lose benefits." In specifying what they mean by the discriminatory establishment of a health benefit plan, the plaintiffs do not cite any terms of the plan itself. Instead, they focus exclusively on United's initial decision to deny benefits based on Julianne's disability, a determination that the Tomkinses concede in their complaint was reversed when United's Member Relations Committee "re-determined the appeal and [determined that] United was now to pay for Julianne's care at New England Medical Center, past and future, in full at regular HMO rates."

In the count of the complaint asserting a cause of action under Title III, the Tompkinses allege:

> 48. . . . the Defendant has discriminated against Plaintiffs, solely on the basis of Julianne's disability, and Kathleen and John's association with Julianne, by denying them full and equal enjoyment of the services, facilities, privileges, advantages, or accommodations of a place of accommodation as otherwise available to the general public; by

-8-

> failing to make reasonable modifications in its contracts, policies, practices, or procedures if these were necessary to afford Plaintiff Defendants' services, facilities, privileges, advantages or accommodations; by refusing or failing to offer continued pre-authorization numbers, payment for New England Medical Center treatment, access to therapy sessions and other benefits as provided by its contract of insurance with the Plaintiffs and its past practice in a place or manner accessible to the Plaintiff; and by failing and refusing to offer alternative services.

This count, like the Title I count, alleges no discriminatory conduct aside from United's initial benefit denial determination. Specifically, it asserts three ways in which United denied the Tompkinses the benefits of a public accommodation,[4] based on Julianne's disability: (1) "by failing to make reasonable modifications in its contracts, policies, practices, or procedures if these were necessary to afford Plaintiff Defendants' services, facilities, privileges, advantages or accommodations"; (2) "by refusing or failing to offer continued pre-authorization numbers, payment for New England Medical Center treatment, access to therapy sessions and other benefits as provided by its contract of insurance with the Plaintiffs and its past practice in a place or manner accessible to the Plaintiff"; and (3) "by failing and refusing to offer alternative services." Each of these allegedly discriminatory actions focuses on United's decision to deny payment

---

[4]We have held in Carparts Distribution Center, Inc. v. Automotive Wholesaler's Association, Inc., 37 F.3d 12, 19-20 (1st Cir. 1994), that "public accommodations" are not limited to actual physical structures, and that the discriminatory denial of benefits under a health care plan might, in some circumstances, state a claim under Title III of the ADA.

for Julianne's treatment at NEMC, a denial which, as discussed above, was reversed through the internal review process.

In an attempt to salvage their case, the Tompkinses stress on appeal that their emotional and financial injuries resulted not merely from the initial benefit denial, but also from the delay and inconvenience in obtaining their benefits through United's internal review process. Although the Tompkinses surely suffered inconvenience and distress as a result of the delay in receiving their health care benefits, that inconvenience and distress was caused both by the initial denial of benefits, for which there is no relief here because of the relief obtained on administrative review, and by the usual operation of the ERISA-mandated internal review process.[5] In order to state a claim for injuries resulting from the review process itself, the Tompkinses would have to allege in the complaint that the internal review process--as opposed to the original denial of benefits--was in some way unusual or prolonged as a result of unlawful discrimination.

---

[5]ERISA § 503, 29 U.S.C. § 1133, provides:

In accordance with regulations of the Secretary, every employee benefit plan shall--

(1) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant, and

(2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.

Here, the complaint is devoid of any allegation that United's review of the Tompkinses claim was discriminatory or differed in any way from the ordinary process afforded any plan member challenging a benefit denial.[6]

In summary, the Tompkinses have already fully recovered for the initial benefit denial; they make no allegations that the review process itself was discriminatory. Therefore, they do not allege the discriminatory denial of any benefit protected by Title I or Title III of the ADA  Their ADA claims were properly dismissed.

### III.  ERISA PREEMPTION

On appeal, the Tompkinses do not dispute that their state law claims "relate to" the ERISA-regulated health care plan. Rather, they argue that: (1) the state anti-discrimination statutes, as part of the overall enforcement regime contemplated by the ADA, are exempt from preemption by ERISA § 514(d), 29 U.S.C. § 1144(d), which excludes federal law from ERISA's preemptive scope; and (2) United waived its right to assert ERISA preemption through its health insurance contract.

---

[6]Indeed, the complaint itself suggests that even United's initial decision to deny coverage, rather than being the result of discrimination, was based on the fact that "United no longer wanted to pay for the high cost of New England Medical Center care."

## A.  Federal Enforcement Scheme

The Tompkinses contend that causes of action based on state human rights legislation are not preempted by ERISA pursuant to the Supreme Court's decision in <u>Shaw</u> v. <u>Delta Air Lines, Inc.</u>, 463 U.S. 85 (1983).[7]  In <u>Shaw</u>, the state of New York argued that the New York Human Rights Law, which required employers to pay pregnancy leave to employees, was exempted from preemption by ERISA § 514(d), 29 U.S.C. § 1144(d), which provides that "[n]othing in this subchapter shall be construed to alter, amend, modify, invalidate, impair, or supersede any law of the United States." This was so, New York argued, because the New York Human Rights Law was a necessary part of Title VII's overall enforcement scheme, and hence within ERISA's federal law exemption from preemption.  <u>See</u> 463 U.S. at 100-01.

The Court acknowledged that "State laws obviously play a significant role in the enforcement of Title VII," and that "Title VII requires recourse to available state administrative remedies." <u>Id.</u> at 101. "Given the importance of state fair employment laws to the federal enforcement scheme, pre-emption of the [New York] Human Rights Law would impair Title VII <u>to the extent that the Human Rights Law provides a means of enforcing Title VII's commands</u>." <u>Id.</u> at 102 (emphasis added).  The Court concluded, however, that the practices made unlawful under the New York Human Rights Law-- failing to pay benefits for pregnancy leave--were not unlawful

---

[7]This argument, if successful, would only save the Massachusetts statutory claims from preemption.

under Title VII.  Thus, it "fail[ed] to see how federal law would be impaired by pre-emption of a state law prohibiting conduct that federal law permitted."  Id. at 103-04.  The Court therefore concluded that "pre-emption would not impair Title VII within the meaning of § 514(d)."  Id. at 103.

The Tompkinses assert correctly that Shaw's reasoning applies to the case at bar.  We have held that the ADA, like Title VII, contemplates that state laws will contribute to the overall federal enforcement regime.  See Carparts Distrib. Ctr., Inc. v. Automotive Wholesaler's Ass'n, 37 F.3d 12, 20-21 (1st Cir. 1994).  Thus, if the Tompkinses' state statutory claims targeted conduct unlawful under the ADA, those state claims would be exempt from ERISA preemption pursuant to ERISA § 514(d).  See Shaw, 463 U.S. at 102-04; Carparts, 37 F.3d at 20-21 (vacating dismissal of state law claims on grounds that they might be found exempt from ERISA preemption as part of the ADA's enforcement scheme).  However, we have already concluded that the Tompkinses have failed to state a claim under the ADA.  Under these circumstances, because the plaintiffs do not contest the district court's finding that their state law claims "relate to" the United health benefits plan, and because the ADA's enforcement regime does not depend on the availability of the state statutory claims, the state claims are subject to ERISA preemption.

## B. Waiver

The Tompkinses assert that United waived its right to claim ERISA preemption based on this provision of its contract with the Tompkinses to provide health insurance:

> In compliance with state and federal law, PLAN shall not discriminate on the basis of age, sex, color, race, disability, marital status, sexual preference, religious affiliation, or public assistance status.

The Tompkinses argue that this commitment to "compliance with state law" operates as an express waiver of United's right to invoke ERISA-preemption as an affirmative defense. We disagree. The cited provision does not approach the type of clear and express language typically required for waiver of a known right. See, e.g., Fowler v. Boise Cascade Corp., 948 F.2d 49, 57-58 (1st Cir. 1991) (under Maine law, applying strict construction standard to waiver of employer immunity under an indemnification agreement); Irons v. Fed. Bureau of Investigation, 880 F.2d 1446, 1452 (1st Cir. 1989) ("Courts sometimes say an individual has 'waived' a protection the law grants him when the individual expressly says that he wishes to do without the protection."); Jardines Bacata, Ltd. v. Diaz-Marquez, 878 F.2d 1555, 1559 (1st Cir. 1989) (waiver must be "unequivocal"). This provision merely expresses United's intent to administer the plan in accordance with applicable laws. It does not waive any rights afforded by federal law.

Although in some circumstances contractual waiver of statutory rights is permissible, see, e.g., Canal Elec. Co. v. Westinghouse Elec. Corp., 548 N.E.2d 182, 187 (Mass. 1990), we find

-14-

no case holding that parties may contractually waive the right to assert ERISA preemption.  Our decision in Wolf v. Reliance Standard Life Ins. Co., 71 F.3d 444, 449 (1st Cir. 1995), relied upon by the Tompkinses, merely holds that ERISA preemption, as an affirmative defense rather than as an element of the court's jurisdiction, is waived if not timely raised.  But Wolf, which addresses only procedural waiver, offers no support for the Tompkinses' contractual waiver argument.

Although "[a] statutory right or remedy may be waived when the waiver would not frustrate the public policies of the statute," see Canal Elec. Co., 548 N.E.2d at 187, "[a] statutory right may not be disclaimed if the waiver could 'do violence to the public policy underlying the legislative enactment,'" see id. (quoting Spence v. Reeder, 416 N.E.2d 914, 924 (Mass. 1981)). ERISA provides an elaborate set of rules "designed to promote the interests of employees and their beneficiaries in employee benefit plans."  Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 90 (1983).[8] In New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co., 514 U.S. 645 (1995), the Supreme Court stated that in passing ERISA Congress intended

---

[8]ERISA contains, inter alia, reporting and disclosure requirements (the ERISA 100s), see 29 U.S.C. § 1021 et seq., participation and vesting guidelines (the ERISA 200s), see 29 U.S.C. § 1051 et seq., funding rules (the ERISA 300s), see 29 U.S.C. § 1081 et seq., rules of fiduciary responsibility (the ERISA 400s), see 29 U.S.C. § 1101 et seq., and criminal and civil enforcement provisions (the ERISA 500s), see 29 U.S.C. § 1131(criminal enforcement); 29 U.S.C. § 1132 et seq. (civil enforcement).

-15-

> to ensure that plans and plan sponsors would be subject to a uniform body of benefits law; the goal was to minimize the administrative and financial burden of complying with conflicting directives among States or between States and the Federal Government . . ., [and to prevent] the potential for conflict in substantive law . . . requiring the tailoring of plans and employer conduct to the peculiarities of the law of each jurisdiction.

Id. at 656-57 (alterations in original). Allowing parties to opt out of ERISA preemption contractually would enable plan sponsors to avoid compliance with ERISA's regulatory structure and would subject ERISA-regulated plans to a multitude of divergent state law causes of action. These results would conflict with Congress's objective of establishing a "uniform body" of federal employee benefits law under ERISA.

We conclude, therefore, that United did not waive its right to raise ERISA preemption as an affirmative defense to the Tompkinses' state law claims, and that ERISA preempts all of those claims.

**Affirmed**.