### Sandra FULLER, Plaintiff,

v.

**LIBERTY LIFE ASSURANCE OF BOSTON, a member of Liberty Mutual Group; the Wachovia Corporation Group Disability Plan (sic); and Wachovia Corporation, Defendants.**

No. CIV. 3:02CV498.

United States District Court, W.D. North Carolina. Charlotte Division.

Feb. 13, 2004.

Julie H. Fosbinder, Charlotte, NC, for Plaintiff.

Keith M. Weddington, Parker, Poe, Adams & Bernstein, Charlotte, NC, for Defendants.

### MEMORANDUM AND ORDER

THORNBURG, District Judge.

**THIS MATTER** is before the Court on the Defendants' motion for summary judgment which is opposed by the Plaintiff. For the reasons stated below, the motion is allowed.

### I. STATEMENT OF FACTS

Plaintiff Sandra Fuller began working for First Union, the predecessor to Defendant Wachovia Corporation,[1] in February 1987. Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment ("Plaintiff's Memorandum"), filed September 9, 2003, at 7. In January 2000, Plaintiff was forced to stop working because of numerous health problems. Amended Complaint, ¶ 5. Plaintiff returned to work in April 2000 but was only able to work for eight days because of her health problems. Plaintiff's Memorandum, at 2.

---

1. The company formerly known as First Union and currently known as Wachovia Corporation will be referred to as the "Employer."

Plaintiff was covered by the First Union Corporation Long Term Disability Plan, now known as the Wachovia Corporation Group Disability Plan (the "Disability Plan"). Amended Complaint, ¶ 4; Defendants' Reply Brief in Support of Summary Judgment ("Defendants' Reply Brief"), filed September 29, 2003, at 1. The Disability Plan is self-insured, meaning that the Employer, rather than an insurance company, is responsible for making the required payments. Exhibit 1, Administrative Record, *attached to* Defendants' Brief in Support of Motion for Summary Judgment ("Defendants' Brief"), filed August 14, 2003, at 438, 440; Defendants' Brief, at 4. The Employer makes such payments out of a Voluntary Employees' Beneficiary Association ("VEBA") trust. Exhibit 2, Affidavit of James Beaver, *attached to* Defendants' Brief, ¶ 3. The Employer's contributions to the VEBA trust constitute a fraction of one percent of the company's operating expenses. *Id.*, ¶ 5.

The Disability Plan provides that "[t]he Employer is the administrator of the Plan," but "[t]he Employer may appoint one or more Employees to conduct the general administration of the Plan, and to have the responsibility for carrying out its provisions." Record, at 439. The Employer did, in fact, appoint employees to administer the Disability Plan. Those employees, Judy Shepard; Rick Winquist, and James Beaver, were known as the Benefits Committee. Beaver Affidavit, ¶ 4. By the terms of the Disability Plan, such appointment does "not constitute delegation of the Employer's responsibility but rather shall be treated as the manner in which the Employer has determined internally to discharge such responsibility." Record, *supra.* The Disability Plan does provide, however, that the "Employer may . . . delegate to any person or entity

any powers or duties of the Employer under the Plan." *Id.*

The Employer hired Defendant Liberty Life Assurance of Boston ("Liberty Life"), a member of Defendant Liberty Mutual Group, to perform certain administrative duties associated with the Disability Plan. Group Disability Risk Management Agreement ("Risk Management Agreement"), *attached to* Supplemental Affidavit of James L. Beaver, *attached as* Exhibit 1 of Defendants' Reply Brief. Among Liberty Life's tasks are the determination of eligibility for benefits, claims processing, investigation of claims, and payment of claims.[2] Risk Management Agreement, at Annex B. If a claimant is dissatisfied with Liberty Life's determination, he or she may appeal to the Employer, who makes a final decision. *Id.*; Record, at 441.

The Disability Plan further provides that the "Plan Administrator [the Employer] shall have the exclusive right and the sole discretionary authority to interpret the terms and provisions of the Plan and to resolve all questions arising thereunder, including, without limitation, the authority to determine eligibility for Benefits and the right to resolve and remedy ambiguities, inconsistencies or omissions in the Plan, and . . . such action shall be exclusive." Record, at 440.

Under the Disability Plan, benefits are to be the lesser of 60 percent of the participant's pre-disability earnings or 66⅔ percent of the participant's pre-disability earnings less the benefits from other income. *Id.*, at 432. "Benefits from other income" include "[t]he amount of any Disability Benefits, or Retirement Benefits the Participant voluntarily elects to receive as retirement payment under the Employer's Retirement Plan" and "[t]he amount

**2.** Although Liberty Life has the duty of paying claims, the Employer must reimburse Liberty

Life within twenty-four hours. Risk Management Agreement, at Annex B.

of Disability and/or Retirement Benefits under the United States Social Security Act." *Id.*, at 424–25. The term "Retirement Benefits" means money that:

(a) is payable under a Retirement Plan either in a lump sum or in the form of periodic payments;

(b) does not represent contributions made by an Employee (payments which represent Employee contributions are deemed to be received over the Employee's expected remaining life regardless of when such payments are actually received); and

(c) is payable upon:

(1) early or normal retirement; or

(2) Disability, if the payment reduces the amount of money which would have been paid under the plan at the normal retirement age.

*Id.*, at 428–29.

When a participant receives benefits from other income in a lump sum, the benefits from other income "will be prorated on a monthly basis over the time period to which the lump sum relates or the maximum benefit period ..., whichever is less." *Id.*, at 436. Furthermore, when a participant receives an overpayment from the Disability Plan, the participant must reimburse the Disability Plan within 60 days or the Disability Plan may reduce future benefits to recover the overpayment. *Id.*, at 438.

Plaintiff received short-term disability benefits between January and July 2000. Amended Complaint, ¶ 5; Defendants' Brief, at 5–6. On July 26, 2000, Liberty Life sent a letter to the Plaintiff advising that her claim for short-term disability benefits beyond July 27, 2000, would be denied. Record, at 321–22. The letter acknowledged that Plaintiff was unable to elevate her arm because of a June 15, 2000, operation. However, the letter further explained that Plaintiff's manager advised Liberty Life on July 19, 2000, that Plaintiff's job did not require her to "reach above shoulder level, climb, drive/travel or lift." *Id.*, at 321. Therefore, Liberty Life concluded there was "no objective medical information on file to support [Plaintiff's] inability to perform [her] job duties." *Id.*

On September 21, 2000, Plaintiff's attorney sent a letter to Liberty Life appealing the decisions to deny Plaintiff short and long-term disability benefits. *Id.*, at 316–17. Plaintiff's attorney requested in the letter that Liberty Life "hold [its] file open for a short period of time so that we may supplement [the] file materials with those we have requested from Dr. Barron's office." *Id.*, at 317.

On October 18, 2000, Plaintiff elected to withdraw a lump sum of $25,213.71 from the First Union Corporation Pension Plan and Trust (the "Retirement Pension Plan"). Exhibit A, Affidavit of Robert Kaska, *attached to* Defendants' Brief in Response to The Court's Order of December 9, 2003 ("Defendants' Response"), filed December 24, 2003, ¶ 5. Plaintiff received a check for $20,170.97 (the after-tax amount) dated December 13, 2000. Plaintiff's Response to Court Order of December 9, 2003 ("Plaintiff's Response"), filed December 29, 2003; Exhibit 2, *attached to* Kaska Affidavit. A letter from Liberty Life to Plaintiff incorrectly states that Plaintiff received the money in August of 2000. Record, at 75. Plaintiff had made no contributions to the Retirement Pension Plan; all contributions to the fund were from the Employer. Plaintiff's Response; Defendants' Response, at 2.

On November 21, 2000, Liberty Life acknowledged receipt of Plaintiff's appeal and explained that it would review the decision regarding short-term benefits first. If Liberty Life determined that Plaintiff was entitled to short-term benefits, it would then reconsider its decision to deny long-term benefits. Record, at 310.

The letter also indicated that Plaintiff had not submitted all the information necessary for Liberty Life to render a decision and requested that she do so. *Id.*, at 310–11. Plaintiff, through her attorney, sent her medical records to Liberty Life on January 30, 2001. *Id.*, at 279.

On February 12, 2001, Liberty Life sent Plaintiff a letter retroactively approving her short-term disability benefits from July 28 through July 31, 2000. *Id.*, at 267. Then, on February 27, 2001, Liberty Life sent Plaintiff a letter that granted her long-term disability benefits, effective retroactively as of July 24, 2000. *Id.*, at 251–53. The letter indicated that Liberty Life would send Plaintiff a check for $8,594.73 on March 1 to cover her accrued benefits. *Id.*, at 253. The letter also stated that "[Plaintiff's] gross monthly benefit is equal to $1371.50 until [she returns] to work or [is] awarded Other Income Benefits." *Id.* The letter advised Plaintiff that Liberty Life reserved the right to recover any overpayment of long-term disability benefits. *Id.*

On April 10, 2001, Plaintiff received notification from the Social Security Administration of a favorable decision. *Id.*, at 199–201. On May 12, 2001, the Social Security Administration informed Plaintiff that she would receive a check in the amount of $6,121.50 for retroactive benefits and that she would receive $838 per month. *Id.*, at 97. Liberty Life then determined that, because Social Security benefits constitute "benefits from other income," Liberty Life had overpaid Plaintiff by $5,567.07. *Id.*, at 92. On June 28, 2001, Liberty Life asked Plaintiff to send a check for that amount and informed her that her new monthly benefit amount would be $713.96 before taxes. *Id.* On July 24, 2001, Plaintiff paid Liberty Life the full amount of overpayment. *Id.*, at 11.

By October 1, 2001, Liberty Life had discovered that Plaintiff had received the lump-sum payment from the Retirement Pension Plan the previous December. *Id.*, at 75. Liberty Life contends that this payment constituted benefits from other income. Answer, filed February 24, 2003, ¶ 7. Pursuant to Article 3.8 of the Disability Plan, Liberty Life divided the roughly $25,200 lump-sum payment by 138, the maximum number of months of long-term disability benefits to which Plaintiff was entitled, and determined that Plaintiff was being overpaid by $182.70 per month. Record, at 76, 436. Therefore, on October 1, 2001, Liberty Life wrote Plaintiff a letter stating that she had been overpaid by $2,371.44 and asked that she send them a check for that amount. *Id.*, at 75.[3]

By July 2002, Plaintiff still had not repaid Liberty Life. On July 22, 2002, Liberty Life spoke with Rick Green, an employee of the Employer. *Id.*, at 16. The Benefits Committee had delegated to Rick Green the duty of coordinating with Liberty Life regarding the recovery of overpayments. Beaver Affidavit, ¶ 6. Green told Liberty Life to give Plaintiff 30 more days to make the repayment before recovering the money by withholding a portion of her monthly disability benefits. Record, at 16.

Liberty Life sent a letter to Plaintiff on July 22, 2002, explaining that, since the monthly disability payments had not been adjusted to reflect the lump-sum withdrawal, the amount of overpayment had grown to $4,202.10. Record, at 26–28.

---

**3.** Defendants' calculations mentioned in this paragraph seem to assume that Plaintiff received her lump-sum payment in August 2000 rather than December 2000. All parties now agree that she received the payment in December. Plaintiff's Response; Exhibit 2, *attached to* Kaska Affidavit. As indicated in the Order below, the Court will allow the parties to make the calculations necessary to correct this mistake.

The letter further stated that if Plaintiff did not return the full amount within 30 days, Liberty Life would begin withholding her monthly benefits. *Id.*, at 27. Finally, the letter stated that Plaintiff's new monthly disability benefit amount, even if she did reimburse them for the overpayment, would be reduced by $182.70, the pro-rated amount of her withdrawal from the Retirement Pension Plan, giving her monthly benefits in the amount of $531.26. *Id.* On August 28, 2002, Plaintiff's new attorney sent a letter to Liberty Life stating that their decision to recoup the amount that Plaintiff received from her pension fund was inequitable and not supported by the language of the Disability Plan. *Id.*, at 21–22. Nevertheless, Liberty Life began withholding a portion of Plaintiff's monthly disability benefits in August 2002. Defendants' Brief, at 10.

## II. PROCEDURAL HISTORY

Plaintiff filed a complaint on November 29, 2002, and amended it on December 19, 2002. Defendants moved for summary judgment on August 14, 2003.

## III. DISCUSSION

### A. Summary judgment standard.

Summary judgment is appropriate when there is no genuine issue of material fact and judgment for the moving party is warranted as a matter of law. Fed.R.Civ.P. 56(c). A genuine issue exists if a reasonable jury considering the evidence could return a verdict for the nonmoving party, here the Plaintiff. *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir.1994) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). By reviewing substantive law, the Court may determine what matters constitute material facts. *Anderson, supra.* "Only disputes over facts that might affect the outcome of the suit under governing law will properly preclude the entry of summary judgment." *Id.* The Defendants as the moving parties have the initial burden to show a lack of evidence to support the Plaintiff's case. *Shaw, supra*, (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). If that showing is made, the burden then shifts to the Plaintiff who must convince the Court that a triable issue does exist. *Id.* A "mere scintilla of evidence" is not sufficient to defeat summary judgment. *Id.* Moreover, in considering the facts of the case for purposes of this motion, the Court will view the pleadings and material presented in the light most favorable to the Plaintiff, as the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

### B. Scope of review

The parties disagree over the scope of review that the Court should apply in examining the initial decision to deny Plaintiff's long-term disability claim and the subsequent decisions to reduce and, eventually, to withhold Plaintiff's benefits. It is unnecessary to determine the appropriate scope of review because the Defendants' motion would be allowed even under a *de novo* scope of review. Therefore, the Court will review Defendants' decisions *de novo.*

### C. Breach of fiduciary duty.

Plaintiff claims that Defendants are fiduciaries as described by 29 U.S.C. § 1002(21)(A), and that they breached the fiduciary duties imposed on them by 29 U.S.C. § 1104. Defendants claim that Liberty Life is not a fiduciary. Whether or not Liberty Life is a fiduciary under § 1002(21)(A), Plaintiff's claim for breach of fiduciary duty is fatally flawed. Therefore, the Court will not address whether Liberty Life is, in fact, a fiduciary.

ERISA provides relief to plan participants for breach of fiduciary duty in §§ 1132(a)(2) and (3).[4] Plaintiff concedes that the type of relief sought in this case, relief that inures to the participant rather than the plan itself, is not available under § 1132(a)(2). Plaintiff's Supplemental Memorandum in Opposition to Defendant's Motion for Summary Judgment ("Plaintiff's Supplemental Memorandum"), filed September 15, 2003, at 6. Therefore, Plaintiff's fiduciary duty claims arise under § 1132(a)(3) and seek "other appropriate equitable relief." Specifically the "appropriate equitable relief" Plaintiff seeks is restitution of 1) the money withheld from her monthly disability benefits as a result of her early withdrawal from the Retirement Pension Plan, and 2) the money that she will lose by not allowing her pension to mature until retirement age. *Id.*, at 8–9. Alternatively, Plaintiff asks to be reimbursed for the amounts already withheld and reinstated into the Retirement Pension Plan. *Id.*, at 9–10.

■ Relief sought under § 1132(a)(3) must be equitable relief, not a claim for monetary damages. *Great–West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 210, 122 S.Ct. 708, 151 L.Ed.2d 635 (2002). A claim for restitution may be legal or equitable in nature. *Id.*, at 212–14, 122 S.Ct. 708. Generally, a claim for restitution is an equitable claim when it seeks "not to impose personal liability on the defendant, but to restore to the plaintiff particular funds or property in the defendant's possession." *Id.*, at 214, 122 S.Ct. 708. "But where 'the property

[sought to be recovered] or its proceeds have been dissipated so that no product remains, [the plaintiff's] claim is only that of a general creditor'" and is a claim at law. *Id.*, at 213, 122 S.Ct. 708 (quoting *Restatement of Restitution § 215*, Comment *a*, at 867 (1936)).

■ Plaintiff's claims for restitution of withheld funds and lost future funds are legal claims that are not cognizable under § 1132(a)(3). There is no contention that the disputed funds have been held separately by Defendants; they are simply a part of the VEBA trust or are in the Defendants' personal possession. Plaintiff is, therefore, not seeking to recover any particular fund but is merely trying to impose general liability on Defendants. Therefore, Plaintiff is procedurally barred from making claims for restitution of withheld funds and lost future funds under § 1132(a)(3).

■ Plaintiff's alternative claim for reinstatement into the Retirement Pension Plan, however, is a claim for equitable relief. In fact, the Fourth Circuit has explicitly held that reinstatement into a pension plan may be appropriate equitable relief under § 1132(a)(3). *Griggs v. E.I. Dupont de Nemours & Co.*, 237 F.3d 371, 384 (4th Cir.2001). Therefore, with respect to Plaintiff's demand for reinstatement, Defendants are incorrect to claim that the relief is not available under ERISA. Defendants' Reply Brief, at 14.

But Plaintiff is not entitled to relief for breach of fiduciary duty because she can-

---

4. Section 1132(a)(2) speaks for itself on this proposition. It reads, "A civil action may be brought by ... a participant for appropriate relief under [the code provision describing liability for breach of fiduciary duty.]" Although § 1132(a)(3) does not specifically state that a participant may seek relief for breach of fiduciary duty, it does provide that "[a] civil action may be brought ... by a partici-

pant ... to obtain other equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan." The Supreme Court has held that the language of § 1132(a)(3) is "broad enough to cover individual relief for breach of a fiduciary obligation." *Varity Corp. v. Howe*, 516 U.S. 489, 510, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996).

not show that there was a breach to begin with. Plaintiff claims that Defendants breached their fiduciary duties in two ways—by initially denying her claim for benefits and then by offsetting, both prospectively and retroactively, her benefits by the prorated amount she received from the Retirement Pension Plan. The Court will now examine each action separately to determine whether either action may constitute a breach of fiduciary duty.

### 1. Initial decision to deny benefits.

■ The Fourth Circuit has held that a plaintiff's claim for breach of fiduciary duty "is actually a claim for benefits where the resolution of the claim rests upon an interpretation and application of *an ERISA-regulated plan* rather than upon an interpretation and application of ERISA." *Smith v. Sydnor,* 184 F.3d 356, 362 (4th Cir.1999). In other words, when a plaintiff is merely claiming that a fiduciary misinterpreted or misapplied an ERISA plan, the proper avenue for relief is a § 1132(a)(1)(B) claim for denial of benefits, not a claim for breach of fiduciary duty. Plaintiff's present claim is simply that Defendants misinterpreted or misapplied the Disability Plan when they initially denied Plaintiff's claim for benefits. Therefore, the claim is properly stated as a claim for denial of benefits and is invalid as a fiduciary duty claim. *Id.*

### 2. Decisions to reduce and withhold payments.

■ The Court will discuss Defendants' decisions to reduce and withhold Plaintiff's benefits payments below. Since the Court concludes that this decision was consistent with the terms of the Disability Plan, it did not constitute a breach of fiduciary duty.

### D. Denial of benefits.

The discussion *supra* dealt with Plaintiff's fiduciary duty claims based on Defendants' decisions to deny Plaintiff disability benefits and subsequently to reduce and withhold disability benefit payments. Plaintiff also asserts a § 1132(a)(1)(B) claim for denial of benefits based on the same two decisions. Again, the Court will examine each decision separately. Here, the issue is whether either decision constituted an unlawful denial of benefits.

### 1. Initial decision to deny benefits.

■ The Court has ruled that Plaintiff's claim based on Defendants' initial decision to deny her benefits was not cognizable as a fiduciary duty claim and that the claim must be brought, if at all, as a claim for denial of benefits. But the claim fails even when cast as one for denial of benefits because Defendants have already reimbursed her the benefits that she was denied, and the Supreme Court has held that plan participants are not entitled to extra-contractual damages for delay in receiving benefits. *Massachusetts Mut. Life Ins. Co. v. Russell,* 473 U.S. 134, 144, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985).[5] Since Defendants retroactively paid Plaintiff the disability benefits that accrued while her claim had been denied and her appeal was

---

5. In a case similar to this one, the First Circuit held that "Although the [Plaintiffs] surely suffered inconvenience and distress as a result of the delay in receiving their health care benefits, that inconvenience and distress was caused both by the initial denial of benefits, for which there is no relief here because of the relief obtained on administrative review, and by the usual operation of the ERISA-mandated internal review process. In order to state a claim for injuries resulting from the *review process itself,* the [Plaintiffs] would have to allege in the complaint that the internal review process—as opposed to the original denial of benefits—was in some way unusual or prolonged." *Tompkins v. United Healthcare of New England, Inc.,* 203 F.3d 90, 95–96 (1st Cir.2000) (footnote omitted).

pending, *Russell* makes it clear that she is entitled to no additional relief. *Id.*

### 2. Decisions to reduce and withhold payments.

■ Plaintiff's second claim for denial of benefits is based on Defendants' decision to reduce, prospectively and retroactively, her monthly disability payments in order to recoup the money she withdrew from the Retirement Pension Plan. In this case, it is not necessary to determine which decisions are attributable to which Defendant as the Court is reviewing all Defendants' decisions *de novo*.

The Disability Plan clearly defines "benefits from other income" to include "[t]he amount of any Disability Benefits, or Retirement Benefits the Participant voluntarily elects to receive as retirement payment under the Employer's Retirement Plan." Record, at 424–25. Equally as clearly, the Disability Plan states that a participant's monthly benefits may be calculated as 66⅔ percent of the participant's pre-disability earnings less the benefits from other income. *Id.*, at 432. The Disability Plan also provides that benefits from other income that a participant receives in a lump sum are to be "prorated on a monthly basis over the time period to which the lump sum relates or the maximum benefit period ..., whichever is less." *Id.*, at 436. Finally, the Disability Plan requires a participant to reimburse the Disability Plan for overpayments and provides that, if a participant fails to reimburse the Disability Plan, his or her monthly benefits may be reduced to recover the overpayment. *Id.*, at 438. Defendants have simply followed the Disability Plan's plain language.

Plaintiff claims that she received the lump sum before she was actually awarded the disability benefits and that, therefore, she did not receive benefits from other income while receiving disability. This argument is not convincing because Plaintiff received retroactive disability payments covering a period that started before the time when she received the lump sum from the Retirement Pension Plan. Therefore, the Defendants made an accurate reading of the Disability Plan and did not deny Plaintiff benefits in violation of § 1132(a)(1)(B).

### E. Forfeiture of vested pension funds.

■ In her response to the Court's January 19, 2004, Order, Plaintiff argues that the Employer, by offsetting the lump-sum payment against her monthly disability payments, is effectively recovering the lump sum that Plaintiff withdrew from the Retirement Pension Plan. Plaintiff argues this violates 29 U.S.C. § 1053(a) which mandates that, after Plaintiff's length of employment, the funds that have accrued in the Retirement Pension Plan for her benefit be nonforfeitable. But even nonforfeitable funds may be reduced by the amount that an employee receives from other sources of income. *Alessi v. Raybestos–Manhattan, Inc.*, 451 U.S. 504, 514, 101 S.Ct. 1895, 68 L.Ed.2d 402 (1981); *PPG Indus. Pension Plan A v. Crews*, 902 F.2d 1148, 1151 (4th Cir.1990). Therefore, even assuming that the Employer is effectively denying Plaintiff her pension benefits, this would not violate § 1053(a) because the Employer could argue that the pension benefits are merely being reduced by the amount of the disability benefits. Since the monthly disability benefits are greater than the pro-rated pension benefits, the pension benefits may be reduced down to zero.

Plaintiff further argues that, even if § 1053(a) permits such a reduction, the Retirement Pension Plan does not call for one. In fact, the Retirement Pension Plan states that the funds that have accrued for Plaintiff's benefit are nonforfeitable. *See* Record, at 617. But mechanically, the

Employer is not taking back Plaintiff's retirement pension. The Employer is following the plain language of the Disability Plan and reducing monthly disability payments by the amount Plaintiff receives as benefits from other income. The Employer has accurately interpreted the Disability Plan. This application does not violate ERISA, and the fact that its effect may negate one term of the Retirement Pension Plan does not prevent the Employer from applying the plain language of the Disability Plan.

In conclusion, the Court would point out that Plaintiff knew that her appeal of the unfavorable disability decision was pending when she elected to receive the lump sum. Furthermore, Plaintiff withdrew the lump sum one month before her attorney provided the Defendants with all of the medical files necessary for the appeal. Though the Court does not blame Plaintiff for her misfortune, perhaps she could have avoided it by providing medical records more promptly.

■ It may well be argued that the Disability Plan provisions relating to "benefits from other income," calculation of monthly benefits, or the method of recovering an overpayment of benefits are employer-friendly. Nevertheless, where plan provisions are unambiguous, they are enforced as written.

> Although ERISA establishes a comprehensive regulatory scheme for employee welfare benefit plans, it does not mandate any minimum substantive content for such plans. Rather, one of the primary functions of ERISA is to ensure the integrity of written, bargained-for benefit plans. To satisfy this objective, the plain language of an ERISA plan must be enforced in accordance with "its literal and natural meaning."

*United McGill Corp. v. Stinnett*, 154 F.3d 168, 172 (4th Cir.1998) (quoting *Health Cost Controls v. Isbell*, 139 F.3d 1070, 1072

(6th Cir.1997)) (other internal citations omitted).

## IV. ORDER

**IT IS, THEREFORE, ORDERED** that the Defendants' motion for summary judgment is hereby **ALLOWED**; a Judgment dismissing this action is filed herewith.

**IT IS FURTHER ORDERED** that the Defendants re-calculate Plaintiff's benefits with the acknowledgment that she received her lump-sum payment in December 2000, not August 2000. If Defendants reduced Plaintiff's benefits to reflect receipt of the lump-sum payment before December 2000, they must reimburse Plaintiff to correct such error.

### *JUDGMENT*

For the reasons set forth in the Memorandum and Order filed herewith,

**IT IS, THEREFORE, ORDERED, ADJUDGED, AND DECREED** that the Defendants' motion for summary judgment is **ALLOWED**, and this matter is hereby DISMISSED WITH PREJUDICE in its entirety.