E. Thomas BYRD, Jr., Plaintiff,

v.

CANADIAN IMPERIAL BANK OF COMMERCE and CIBC World Markets Corp., Defendants.

C.A. No. 2:04–0783–23.

United States District Court,
D. South Carolina,
Charleston Division.

Jan. 20, 2005.

Walter Henry Bundy, Jr., Stanley Eugene Barnett, Smith Bundy Bybee and Barnett, MT Pleasant, SC, for Plaintiff.

Amy Yager Jenkins, Ellis Reed–Hill Lesemann, Nelson Mullins Riley and Scarborough, Charleston, SC, for Defendants.

## ORDER

DUFFY, District Judge.

This matter is before the court upon the parties' cross motions for summary judgment. For the reasons set forth herein,

Defendants' Motion for Summary Judgment is granted, and Plaintiff's Motion for Summary Judgment is denied.

## BACKGROUND

In March of 1999, Plaintiff left his position as a securities broker with Prudential Securities in Charleston, South Carolina to begin employment as a broker with CIBC Oppenheimer [1] and to open CIBC's Mount Pleasant, South Carolina office. (Am. Comp.¶, ¶ 4,5). Plaintiff contends that in an attempt to induce him to leave Prudential and join CIBC, Defendants offered him (1) long term disability ("LTD") benefits equaling the amount he carried with Prudential, or $25,000 per month, and (2) participation in CIBC's Wealth Plus Plan ("WPP"). (Am.Comp.¶ 6). Plaintiff signed an Employment Agreement and an Account Executive Compensation Schedule on March 25, 1999. Defendants contend that neither of these agreements contained promises regarding disability or WPP benefits. Specifically, Defendants cite a provision of the Employment Agreement which provides

> Aside from the terms set forth herein, you have no other agreements or understandings, written or oral, with CIBC Oppenheimer regarding compensation with the exception of your Salesman's Compensation Schedule ... this Agreement embodies the entire understanding of the parties and supersedes all prior understandings of the parties, whether oral or written, in connection with the subject matter hereof.

(Def. Ex. 5; CIBC 0125–0130). Additionally, at the time Plaintiff was hired, he received a lump sum loan of $664,000. The Employment Agreement provided that this loan would be forgiven in yearly increments of $132,800 over a five-year period, and that if Plaintiff left CIBC before the loan's forgiveness in full, he would immediately owe the balance of the loan to CIBC. *Id.*

### A. LTD Benefits

In early 2002, Plaintiff was diagnosed with an incurable, progressive vision disorder. Around this time, Plaintiff inquired about his disability benefits coverage to the CIBC benefits department. Plaintiff contends that he was told that he had $25,000 in coverage (Pl. Dep. at 54). In response to his inquiry, CIBC's benefits department faxed Plaintiff a one page "Confirmation of Benefits Elections" form dated January 1, 2002, which set forth Plaintiff's benefits elections. The elections form confirmed Plaintiff's enrollment in the long-term disability plan, and stated that his "Coverage Category/Amount" was $25,000. Of particular importance to the present dispute, this $25,000 figure had an asterisk beside it with a notation which explained that "Monthly Benefit is 60% of Pay." (Def. Ex. 8, UNUM 009).[2] While Plaintiff believed he qualified for disability payments of $25,000 per month, Defendants contend that what this notation on the benefits form meant was that $25,000 was the maximum monthly earnings that would be used to calculate monthly disability benefits. (Asman Aff. ¶ 5).[3]

---

**1.** Apparently, CIBC Oppenheimer Corp. changed its name to CIBC World Markets Corp. around May of 1999. Defendant CIBC World Markets is an indirect wholly owned subsidiary of Defendant CIBC. The court refers to Defendants collectively as "CIBC" throughout this Order.

**2.** Plaintiff has produced a copy of this form without the asterisk and accompanying notation. While it is certainly true that the Confirmation of Benefits Elections forms were far from clear, as discussed later, the Plan itself described the benefits calculation in detail.

**3.** According to Asman, the Director of Employee Relations (Human Resources) for CIBC, the monthly benefits amount would be 60% of $25,000 = $15,000.

The LTD plan (hereinafter "the UNUM LTD plan") explained this calculation in a section entitled "Schedule of Insurance, Disability Benefits and Requirements." (Def. Ex. 9 at 4). That section read as follows:

## DISABILITY BENEFITS AND REQUIREMENTS

| | |
|---|---|
| LTD BENEFITS AMOUNT | Earnings multiplied by the LTD Benefit Percentage, not to exceed the Maximum LTD Monthly Benefit Amount, minus Benefit Offsets |
| LTD BENEFITS PERCENTAGE | 60% |
| . . . | |
| MAXIMUM MONTHLY LTD BENEFITS AMOUNT | $15,000 before reduction by Benefit Offsets |

*Id.*

On May 3, 2002, Plaintiff notified his managers that he intended to elect disability benefits due to his eye problems. On May 10, 2002, CIBC's payroll administrator, EDS/CIBC People Matrix (hereinafter "EDS"), confirmed Plaintiff's application for disability leave and reiterated that "[s]hould you qualify for long-term disability. your pre-disability salary would be 60% to a [m]aximum of $15,000 a month." (Def.Ex.11). On May 24, 2002, Plaintiff wrote to his managers stating that he wished to cancel his Employment Agreement because he could not receive his WPP funds while remaining an active employee. (Def.Ex.12). However, Asman warned Plaintiff that if he took this step, he would be responsible for the balance of the loan he had obtained when hired. (Asman Aff. ¶ 6). Thus, Plaintiff decided to remain employed and apply for disability leave. (Def.Ex.9).

Defendant CIBC provided Plaintiff with various forms to fill out related to his disability.[4] CIBC forwarded all of Plaintiff's documentation to its long-term disability insurance carrier, Provident Life & Accident Casualty Company, later known as Unum/Provident ("UNUM"). (Asman Aff. ¶ 9). By letter dated December 5, 2002, UNUM informed Plaintiff that he had been approved for long-term disability benefits. (Def.Ex.20). UNUM notified Plaintiff that his elimination period of ninety days was satisfied on November 16, 2002, and that his first check covered the period from November 17, 2002 through November 20, 2002. *Id.* As Defendants concede, UNUM erroneously based his monthly benefit amount on "60% of [Plaintiff's] pre-disability income averaged over the past 12 months." *Id.* CIBC notified UNUM that the Plan had been amended to base benefits on 60% of average earnings over the past *three years*. (Def.Ex.21). UNUM wrote Plaintiff to notify him of the mistaken calculation and confirmed that he would be receiving compensation for the underpayment. *Id.* UNUM also confirmed that all future checks would be in the amount of $15,000, "the maximum monthly benefit." *Id.* Since December of 2002, Plaintiff has consistently received this maximum monthly benefit from UNUM. (Byrd Dep. at 158).

Relatedly, and at the very heart of the dispute surrounding Plaintiff's entitlement

---

**4.** Apparently, EDS initially provided Plaintiff with a Family and Medical Leave Act ("FMLA") form rather than a long-term disability form. Defendants contend that this was an inadvertent error by EDS, and that once EDS discovered its mistake, it provided the correct long term disability application to Plaintiff on May 28, 2002.

to LTD benefits, for a very short period of time, CIBC apparently allowed its highly compensated employees, including Plaintiff, the opportunity to purchase supplemental long term disability insurance from a Paul Revere, a third party insurance company. CIBC did not pay for any of the premiums, but supposedly made payroll deductions from the wages of individuals who purchased this supplemental insurance. CIBC would then forward this amount to the insurer. According to Asman, all employees who purchased supplemental insurance were required to fill out and submit an application for supplemental coverage, and to make regular premium payments via wage deductions. (Asman Aff. ¶ 12). Plaintiff contends that in his second year with CIBC, his salary (over $300,000) met the threshold for supplemental long term disability coverage, and he elected coverage in the amount of $10,000 per month. Defendants argue that Mr. Byrd never applied and paid for a supplemental policy.

## B. The WPP

Plaintiff also claims that he has been wrongfully denied benefits under the WPP. The WPP was a plan designed to provide CIBC executives like Plaintiff with "the opportunity to build long-term wealth via financial awards and permitting the voluntary deferral of compensation under the provisions of the Plan." (Def. Ex. 38, Article 1.2). Plaintiff began participating in the WPP on November 1, 2000, and elected to have three percent of his income deferred into the WPP during his employment. (Def. Ex. 42, 43; Richards Aff. ¶ 8).

Each month, CIBC contributed a "firm matching credit" equal to fifty percent of what the employee contributed. Aside from this firm matching credit, there were several other credits available to eligible employees. First, a "Firm Annual Credit" was given under certain circumstances, in-cluding meeting certain production requirements over the prior twelve month period. Plaintiff received the Firm Annual Credit in November of 2001 because he met the production requirements over the prior twelve months. (Def.Ex.45). In 2002, Plaintiff did not qualify for this credit because his production was not high enough that year. (Richards Aff. ¶ 12). Other types of credits under the WPP included the "Firm Initial Credit" and the "Firm Second Credit." According to Defendants, Plaintiff was not entitled to either of credits by virtue of the loan he had taken out and the length of time employed by CIBC, respectively.

Plaintiff stopped making payments into the WPP when he ceased earning income during 2002. (Richards Aff. ¶ 9). At this point, Plaintiff applied for and received accelerated vesting status from the WPP administration committee. As of January 2003, Plaintiff's entire WPP account balance was $11,530.44, and it was entirely vested due to his disability. (Richards Aff. ¶ 17). On January 6, 2003, the WPP was terminated in conjunction with a divestiture of CIBC Oppenheimer to Fahnestock Viner Holdings. CIBC notified Plaintiff of this termination by letter dated January 17, 2003, and informed him that he would receive his "vested balance plus a pro-rata portion of the unvested principal amount of the Firm Initial Credit and the Firm Second Credit, if any, allocated to your account." (Def.Ex.40).

Plaintiff did not receive a distribution during 2003 because, according to Defendants, he owed substantial amounts of money to CIBC pursuant to his initial loan. Under a provision of the WPP entitled "Right of Offset," "[v]ested amounts in a Participant's Account will be available to, and may be used for, offsetting any other financial obligations the individual may have with the Firm." (Def. Ex. 38 at ¶ 7.5). Thus, in 2003, the $11,530.44 that was fully

vested in Plaintiff's WPP account was applied against the debts he owed CIBC. (Richards Aff. ¶ 19). Despite this credit to his outstanding loan, in August of 2004, Defendants paid Plaintiff $11,530.44.[5]

In an Amended Complaint filed April 8, 2004, Plaintiff raised the following claims: (1) breach of contract ("Count One"); (2) breach of contract accompanied by fraudulent act ("Count Two"); (3) fraud ("Count Three"); (4) estoppel ("Count Four"); (5) denial of benefits pursuant to ERISA § 1132(a)(1)(B)[6] ("Count Five"); (6) breach of fiduciary duty and entitlement to injunctive or other equitable relief pursuant to ERISA § 1132(a)(3) ("Count Six")[7]; (7) breach of fiduciary duty pursuant to ERISA § 1109 ("Count Seven"); and (8) refusal to provide information in violation of ERISA § 1132(c) ("Count Eight"). The court dismissed Plaintiff's first four causes of action by Order filed May 10, 2004. Plaintiff has now withdrawn Counts Seven and Eight. (Pl. Mem. at 13–14). Accordingly, the only claims presently pending before this court are Counts Five and Six, denial of benefits and breach of fiduciary duty, respectively.

### STANDARD OF REVIEW

To grant a motion for summary judgment, this court must find that "there is no genuine issue as to any material fact." Fed.R.Civ.P. 56(c). The judge is not to weigh the evidence, but rather to determine if there is a genuine issue of fact. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d

202 (1986). If no material factual disputes remain, then summary judgment should be granted against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party bears the burden of proof. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). All evidence should be viewed in the light most favorable to the non-moving party. *See Perini Corp. v. Perini Constr., Inc.,* 915 F.2d 121, 123–24 (4th Cir.1990).

### ANALYSIS

Defendants seek summary judgment on the grounds that (1) neither CIBC entity is a proper defendant in an action to recover benefits under the UNUM LTD or WPP plans; (2) Plaintiff received the maximum amount of monthly benefits due under the UNUM LTD plan, and thus Plaintiff's claim for denial of benefits and breach of fiduciary duty with respect to long term disability benefits fails as a matter of law; and (3) Plaintiff has received all amounts due to him under the unambiguous terms of the WPP, and thus his claim for denial of benefits and breach of fiduciary duty with respect to the WPP similarly fails as a matter of law. Plaintiff counters that he is entitled to summary judgment for two reasons. First, Plaintiff contends that he elected supplemental long term disability insurance in the amount of $10,000 per month, and that Defendants refused to provide it for him. Second, Plaintiff argues that he is entitled to the Firm Initial

---

**5.** Defendants assert that CIBC's motivation in making this payment was that it was not able to confirm whether a payout or offset occurred in January of 2003 and thus "erred on the side of issuing another check." (Def. Mem. at 15). Defendants now maintain that Plaintiff has received twice what he was owed under the WPP. *Id.*

**6.** In the Amended Complaint, Plaintiff mistakenly referred to this section as 29 U.S.C.

§ 1132(a)(1)(B). The court assumes this was a clerical error and cites the proper section of the statute.

**7.** Both this claim and Plaintiff's claim for denial of benefits were labeled as Plaintiff's "Fifth Cause of Action." As the court believes this was in error, and for ease of reference, the court terms Plaintiff's claim for breach of fiduciary duty pursuant to § 1132(a)(3) "Count Six."

Credit provided for in the WPP plan, and that Defendants wrongfully denied him this credit. As the claims at issue involve distinct factual allegations with respect to the LTD plan and the WPP, the court separates its analysis accordingly. The court then considers the merits of Plaintiff's Count Six, violation of 29 U.S.C. § 1132(a)(3), with respect to both the LTD plan and the WPP. In the final section of this Order, the court considers Defendants' request for attorneys' fees.

## A. The Long Term Disability Plan

Defendants' first argument with respect to the long term disability plan is that neither CIBC entity is a proper defendant, as these entities did not administer or control any aspect of benefits administration or decisionmaking under the UNUM LTD plan. In an attempt to quell this argument from the start, Plaintiff argues that the court has already decided this issue in ruling on an earlier Motion to Dismiss filed by Defendants.[8] Plaintiff then clarifies that his claim is not that he was denied benefits under the UNUM LTD plan, but rather, that he elected supplemental insurance which Defendants failed to provide.

█ As a threshold matter, the court notes that Plaintiff's claim for "denial of benefits" under the "Long Term Disability Plan" is somewhat mislabeled. While Plaintiff's Amended Complaint alleges that "Plaintiff made application to Defendants for benefits due him under the Long Term Disability Plan ... [and] Defendants have denied Plaintiff such benefits in violation of [ERISA,]" (Am.Compl.¶ 59), Plaintiff admits that he was paid the full amount of benefits due under the UNUM LTD plan. (Byrd Dep. at 158). Because Plaintiff has now clarified that his claim is that Defendants failed to enroll him in, and accordingly failed to pay benefits pursuant to, a supplemental disability plan, the court construes his action as one to clarify his rights pursuant to a plan. See 29 U.S.C. § 1132(a)(1)(B) (providing that a civil action under this section may be brought by a participant "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."). Moreover, because of Plaintiff's clarification that he received all benefits due under the UNUM plan, the court need not consider whether Defendants are a proper defendant with respect to this plan, or whether Defendant wrongfully denied benefits under the UNUM plan.[9] Instead, the court moves to a consideration of whether Plaintiff's new-

8. The court disagrees with this characterization of its prior Order. As Defendants point out, the court merely concluded that, given the deferential Rule 12(b)(6) standard, Plaintiff had properly asserted facts to support a claim against Defendants at that time. Now, however, the court considers additional evidence and may revisit its earlier conclusion under the standard set forth in Rule 56.

9. If the court were to consider these two issues, it would find that Defendants were entitled to summary judgment on both. First, as Defendants note, Section 1132(a)(1)(B) claims against employers are only proper if the employer has control over the administration of the plan. See, e.g., Mein v. Carus

Corp., 241 F.3d 581, 584–85 (7th Cir.2001)(an employer can be the proper defendant if the employer and the plan are closely inter-twined); Daniel v. Eaton Corp., 839 F.2d 263, 266 (6th Cir.1988) (employer can be proper party defendant if shown to control plan administration); Marcum v. Zimmer, 887 F.Supp. 891, 894 (S.D.W.Va.1995) (same). Here, it appears that UNUM alone conducted the administration of the plan. As Defendants point out, the long term disability plan provided that UNUM had "the sole and exclusive discretion and power to grant and/or deny any and all claims for benefits, and construe any and all issues relating to eligibility for benefits." See, e.g., Def. Mem., Ex. 9. UNUM, not Defendants, collected Plaintiff's

ly-clarified claim—that he should have been enrolled in a supplemental benefits program and was not—constitutes a violation of ERISA's § 1132(a)(1)(B).

■ The first inquiry in this determination is whether CIBC is a proper defendant in such an action. Here, however, the court assumes without deciding that CIBC is a proper party to Plaintiff's claim, as, even assuming CIBC is a proper defendant, Plaintiff's claim fails for a more fundamental reason. As Defendants argue, Plaintiff has wholeheartedly failed to demonstrate that he elected to participate in a supplemental insurance plan.

The Supplemental Long Term Disability Plan referred to by Plaintiff provides

> If your annual benefit salary is more than $300,000, you can increase your monthly benefit under the primary Long Term Disability Plan by *purchasing* supplemental Individual Long Term Disability Insurance. Supplemental Individual Long Term Disability insurance increases the maximum monthly benefit to which you're entitled so you would not be affected by the primary plan's $15,000 monthly maximum.

(Def.Ex.24) (emphasis added). While the court does not doubt that such a plan existed, Plaintiff admits that he cannot find documentation to prove that he filled out the application for supplemental benefits or that he paid for this insurance. *See*

Pl. Dep. at 27. More persuasive than Plaintiff's lack of proof, however, is Defendants' affirmative evidence that Plaintiff never enrolled in a supplemental plan. First, CIBC's supplemental long term benefits provider, Paul Revere (also a UNUM/Provident entity) has no records indicating that Plaintiff applied for, or is entitled to, supplemental coverage. (Def.Mem., Ex. 29) ("Please be advised that I have researched all our Paul Revere systems and it appears that Mr. Byrd did not own any Paul Revere policies. . . ."). According to Paul Revere, it has "no information indicating [it has] ever maintained a policy on this individual[.]" *Id.* Defendants' own records support this conclusion, as Plaintiff's name is noticeably absent from a spread sheet maintained by CIBC that identifies all CIBC employees who applied and paid for supplemental coverage. (Def.Mem., Ex. 27). Finally, Plaintiff's payroll records plainly demonstrate that he did not pay for supplemental benefits. (Def. Mem., Ex. 27; Def. Reply, Ex. A).

Unfortunately for Plaintiff, his conclusory allegations that he knows he enrolled in supplemental insurance, and his assistant's testimony that it was Plaintiff's pattern and practice to elect the maximum amount of benefits, cannot defeat Defendants' well-supported argument, including documentation, that Plaintiff did not elect or pay for supplemental coverage.[10] Federal

long term disability application, medical history, and wage history information, and was the entity solely responsible for concluding that Plaintiff was disabled. (Def.Mem., Exs.15, 20, 32). Further, Plaintiff admits that he received all checks directly from UNUM, not from Defendants. (Byrd Dep. at 158).

Moreover, as mentioned above, Plaintiff has no claim that he was denied benefits under the UNUM long term disability plan. It is undisputed that Plaintiff has been paid the maximum amount of benefits due under the UNUM Plan since December of 2002. (Byrd Dep. at 158). Plaintiff admits this amount is

all that he is due under the UNUM policy. *Id.* Accordingly, there is no genuine issue of material fact as to whether Plaintiff has been denied LTD benefits under the UNUM plan, and Defendants are entitled to summary judgment on this claim.

10. The court does not mean to suggest that Plaintiff's intentions were to avoid his obligations with respect to supplemental coverage. Rather, the court simply concludes that, upon the evidence before it, the most logical conclusion is that Plaintiff inadvertently failed to fill out the necessary forms.

Rule of Civil Procedure 56(e) requires Plaintiff to go beyond the "mere allegations or denials" of the pleadings and by his own affidavit, or by the "depositions, answers to interrogatories and admissions on file, designate specific facts showing there is a genuine issue for trial." *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 56(e)); *see also Mitchell, Best & Visnic, Inc. v. Travelers Property*, 35 Fed.Appx. 75, 2002 WL 1018562 (4th Cir.2002) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). "[S]ufficient evidence (pertinent to the material issue) *must be identified by reference* to an affidavit, a deposition transcript or a specific exhibit incorporated therein." *Thomas v. Wichita Coca–Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir.1992) (emphasis added). Simply stated, Plaintiff's deposition testimony stating that he has seen paperwork confirming his election of supplemental benefits is not, in the absence of the actual paperwork demonstrating this election, sufficient to overcome Defendants' summary judgment motion.

tion. *See, e.g., Harleysville Mutual Ins. Co. v. Packer*, 60 F.3d 1116, 1120 (4th Cir.1995) (explaining, in connection with affirming a grant of summary judgment, that if the evidence is so one-sided, then that position prevails as a matter of law); *see also Kennedy v. Applause, Inc.*, 90 F.3d 1477, 1480 (9th Cir.1996) (agreeing with the district court that self-serving, inconsistent deposition testimony did not create a genuine factual dispute capable of defeating a properly supported motion for summary judgment). Because Plaintiff has failed to produce any concrete evidence that he elected supplemental insurance or that Defendants failed to enroll him in supplemental coverage at his request,[11] Defendants are entitled to summary judgment on Plaintiff's § 1132(a)(1)(B) claims with respect to the LTD benefits plan.

## B. The WPP[12]

First, Defendants again argue that neither CIBC entity is a proper defendant with respect to Plaintiff's WPP claims. Defendants further contend that even if

---

11. To the extent that Plaintiff continues to believe (and attempts to support his summary judgment motion by showing) that he was enrolled in supplemental insurance because his statement of benefits "showed the long term disability coverage in the amount of $25,000 per month," *see* Byrd Aff. ¶ 13, the court disagrees. The Confirmation of Benefits Election Form does not say that Plaintiff is entitled to $25,000 in long term disability benefits per month, but rather, states that Plaintiff's "Coverage Category" is $25,000. (Pl.Mem., Ex. 4). As articulated in the Plan Itself, and on at least one of the forms received by Plaintiff, *see* Def. Mem., Ex. 8, the maximum monthly benefit amount was "$15,-000 before reduction by Benefits Offsets." (Def. Mem., Ex. 9 at 4). The LTD benefits percentage was 60%. Thus, LTD benefits were to be calculated as 60% of the maximum monthly income amount, to a maximum in benefits of $15,000. Plaintiff was undoubtedly a highly compensated employee making over $25,000 per month, but the $25,000 fig-

ure was the largest figure that could be used as a "Coverage Category" without exceeding the maximum amount of benefits, $15,000 (e.g., 60% of $25,000 = $15,000 per month). The court is bound to enforce the plain language of the Plan, which clearly details the maximum amount of benefits as $15,000 per month. *See, e.g., United McGill Corp. v. Stinnett*, 154 F.3d 168, 172 (4th Cir.1998) (internal quotations omitted) ("[T]he plain language of an ERISA plan must be enforced in accordance with 'its literal and natural meaning.' ").

Accordingly, because of the Plan language explaining the calculation of benefits, the Confirmation of Benefits Election Form is not evidence that Plaintiff elected $10,000 in supplemental benefits to bring his total coverage to $25,000 a month.

12. The parties do not dispute that the WPP was a "plan" within the meaning of ERISA, 29 U.S.C. § 1002(1)(A).

CIBC is a proper defendant on this claim, Plaintiff's claim fails because "[t]he WPP has been applied to [P]laintiff consistent with its terms, and he has received everything to which he is entitled under that plan." (Def. Mem. at 22). Plaintiff counters that Defendants' failure to provide him with the Firm Initial Credit [13] of the WPP constitutes a violation of 29 U.S.C. § 1132(a)(1)(B). The court begins its analysis by considering the propriety of CIBC as a defendant and the applicable standard of review with regard to Plaintiff's WPP claim. The court then turns to the merits of Plaintiff's claim.

### 1. CIBC as Plan Administrator

■ ERISA confers the right to sue the plan administrator, or a fiduciary of the plan, for benefits. "Proof of who is the plan administrator may come from the plan document, but can also come from the factual circumstances surrounding the administration of the plan, even if these factual circumstances contradict the designation in the plan document." *Hamilton v. Allen–Bradley Co.*, 244 F.3d 819, 824 (11th Cir.2001).[14] The critical inquiry is whether the alleged administrator has "sufficient decisional control over the claim process." *Id.; see also Fisher v. Metropolitan Life Insurance Co.*, 895 F.2d 1073, 1077 (5th Cir.1990) (finding "intuitive appeal" in the argument that insurance company was a 'de facto' administrator when it was "delegated a wide range of responsibility" and processed all claims and appeals procedures).

■ Here, the WPP designated that a Committee of at least three individuals had "absolute and complete discretion with respect to the operation, interpretation, and administration of the Plan." (Def. Mem., Ex. 38 at ¶ 9.1). Notably, that Committee was comprised of individuals appointed by the President of CIBC World Markets "and his direct reports." *Id.* at ¶ 2.10. In the court's opinion, there is no question that a Committee comprised of individuals appointed by CIBC led to the situation where, even if the express terms of the plan did not provide that CIBC, as a corporate entity, was the plan administrator, in practice, CIBC had "sufficient decisional control over the claims process" to be considered an administrator of the plan.[15] *See Hamilton*, 244 F.3d at 824. Thus, the court must proceed to the question of whether Defendants were vested with sufficient discretionary authority to warrant a deferential abuse of discretion standard of review.

---

**13.** Plaintiff's Amended Complaint did not limit his WPP claims to the issue of whether he received the Firm Initial Credit. However, in his Motion for Summary Judgment and Reply to Defendants' Motion for Summary Judgment, Plaintiff clarifies that Defendants' failure to credit his WPP account for the Firm Initial Credit is the gravamen of his complaint. *See, e.g.,* Pl. Mem. at 12; Pl. Reply at 1. Accordingly, the court only considers Defendants' denial of this credit as a basis for liability on the WPP claims.

**14.** Many Circuits deem the insurer a "de facto plan administrator" in this situation. *See, e.g., Hamilton,* 244 F.3d 819. While the Fourth Circuit has not employed this precise language, the court has used a functionally analogous approach in determining whether an insurance company was a fiduciary for ERISA purposes. *See, e.g., Doe,* 3 F.3d at 87.

**15.** The court would also find that CIBC was a fiduciary of the WPP. ERISA defines a fiduciary as one who "exercises any discretionary authority or discretionary control respecting management of such plan" or "has any discretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C. § 1002(21); *see also Griggs,* 237 F.3d at 379–80. Here, CIBC, through the Committee comprised of individuals both working for CIBC and hand-picked by its President, clearly had discretionary responsibility in the administration of the WPP.

## 2. Standard of Review

■ "A denial of benefits challenged under [29 U.S.C.] § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire and Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). If there is sufficient discretionary authority, then the abuse of discretion standard applies and the denial will not be reversed "if reasonable, even if the court itself would have reached a different conclusion." *Booth v. Wal–Mart Stores, Inc. Assoc. Health and Welfare Plan,* 201 F.3d 335, 340 (4th Cir.2000). This means that so long as the denial of benefits is the result of "a deliberate, principled reasoning process and ... is supported by substantial evidence," it will not be disturbed. *Brogan v. Holland,* 105 F.3d 158, 161 (4th Cir.1997).

■■ Even under this deferential standard of review, however, evidence that the administrator or fiduciary who denied benefits was operating under a conflict of interest is relevant and "must be weighed as a facto[r] in determining whether there is an abuse of discretion." *Firestone,* 489 U.S. at 115, 109 S.Ct. 948. Thus, the Fourth Circuit has explained: "[t]he more incentive for the administrator or fiduciary to benefit itself by a certain interpretation of benefit eligibility or other plan term, the more objectively reasonable the administrator or fiduciary's decision must be and the more substantial the evidence must be to support it." *Ellis v. Metropolitan Life Ins. Co.,* 126 F.3d 228, 233 (4th Cir.1997).

The Fourth Circuit has employed a "sliding scale" approach to denials of benefits when the administrator or fiduciary has a financial incentive to benefit itself by denying benefits. *Id.* Under this approach, the court must review the denial of benefits with "some deference, but this deference will be lessened to the degree necessary to neutralize any untoward influence resulting from the conflict." *Doe v. Group Hospitalization and Medical Serv.,* 3 F.3d 80, 87 (4th Cir.1993).

■■ Here, CIBC, through the Committee, clearly had the discretionary authority to determine eligibility for WPP benefits. *See* Def. Mem., Ex. 38 at 9.1. In fact, the Committee is vested with discretion to interpret plan provisions, determine eligibility for WPP benefits, and craft rules and regulations governing the Plan. *Id.* Thus, the court reviews the Committee's actions under an abuse of discretion standard. *See United McGill Corp. v. Stinnett,* 154 F.3d 168, 171 (4th Cir.1998) (finding discretionary authority where a plan granted the administrator authority to "construe the terms of the Plan and resolve any disputes which may arise with regard to the rights of any persons under the terms of the plan."); *Boyd v. Trustees of the United Mine Workers Health & Retirement Funds,* 873 F.2d 57, 59 (4th Cir.1989) (finding implied discretionary authority where the administrator was given the power of "full and final determination as to all issues concerning eligibility for benefits" and was "authorized to promulgate rules and regulations to implement this Plan.").[16] The court remains unsure of the precise degree to which this standard should be modified to reflect the po-

16. Notably, these cited cases deal with an implied grant of discretionary authority to the *plan administrator.* As discussed above, CIBC is not the named plan administrator. However, because this court has concluded that CIBC is effectively acting as a plan administrator (or what some courts would term a 'de facto plan administrator') with respect to the WPP, the cases are nonetheless applicable to resolving the question of the grant of discretion to CIBC in this case.

tential conflict of interest of Committee members, given the lack of information presented on whether the Committee members are typically CIBC employees tasked with expending as little of the company's funds as possible. It is clear that at least two CIBC employees, Suzanne Richards, the Senior Director/Human Resources Coordinator for CIBC World Markets, and Paul Duffy, an individual holding various consultant and employment positions with CIBC, served on the Committee. (Richards Aff. ¶ 3; Duffy Aff. ¶ ¶ 3,5). Even assuming that there is a strong conflict of interest, and hence Defendants' decision must be objectively reasonable and supported by significant substantial evidence, as described below, the court concludes that Plaintiff cannot demonstrate that the failure to pay him the Firm Initial Credit was an abuse of discretion.[17]

### 3. CIBC's Decision to Withhold the Firm Initial Credit

The WPP describes the Firm Initial Credit as follows

> For any individual AE [account executive] who was hired by the Sponsor *after April 1, 1998 and through October 31, 1999,*[18] *and has received* a Special Payout Arrangement, the Firm will, upon expiration of such Special Payout Arrangement and fulfillment of the eligibility provisions as of the start date of the next Production Eligibility Hurdle as described in Section 3.1 hereof, contribute to the Participant's Account an amount equal to 20% of the Compensation in the year that the AE qualifies after the Spe-

cial Payout Arrangement's termination. The contribution will be made as of the beginning of the Plan Year after the Special Payout Arrangement ends.

> For any individual who was hired by the Sponsor after April 1, 1998 and through October 31, 1999, *and has not received* a Special Payout Arrangement, the Firm will, on the first day of the first Plan Year in which the individual is eligible to participate, contribute an amount equal to 20% of Compensation to such Participant's Account.

(Def. Mem., Ex. 38 at ¶ 4.1).[19] A Special Payout Arrangement is defined as "any individual AE [account executive] payout arrangement specifically negotiated by said individual that provides a payout in excess of the Firm's Standard Commission Payout Policy."[20] *Id.* at ¶ 2.23.

Defendants' proffered reason for failing to pay Plaintiff the Firm Initial Credit is that, at the time in question, Plaintiff had an outstanding loan which constituted a "Special Payout Arrangement." Plaintiff argues that the loan in question was not a special payout arrangement, but the court disagrees. First, the language defining a special payout arrangement is decidedly broad, including "any payout arrangement" negotiated by an executive such as Plaintiff that ·is "in excess of the Firm's Standard Commission Payout Policy." (Def. Mem., Ex. 38 at ¶ 2.23). The court can think of no plausible reason why a forgivable loan issued to Plaintiff that was clearly in excess of his standard commis-

---

**17.** Even if the court were to employ a *de novo* standard of review as encouraged by Plaintiff, the court would reach the same conclusion.

**18.** This category properly describes Plaintiff, who was hired in March of 1999.

**19.** Defendants have provided both a 1998 and 2002 version of the Wealth Plus Plan. The Firm Initial Credit provisions appear to be

identical in both versions. *See* Def. Mem., Ex. 38 and 39 at ¶ 4.1.

**20.** Standard Commission Payout Policy is defined as "encompass[ing] all broadly applicable stated policies in effect from time to time with respect to commission payout levels, subject to the interpretation of the Committee in good faith." (Def. Mem., Ex. 38 at ¶ 2.25).

sion would not fall within this definition. Plaintiff argues that the word "payout" only refers to commissions paid to brokers on their sales of securities; thus, Plaintiff appears to suggest, the section only applies when a broker has received *commissions* in excess of the standard commission payout policy. (Pl. Reply at 4). In the court's opinion, Plaintiff's argument forces a strained reading of the special payout provision, particularly given the evidence that within the brokerage community, the term "special payout arrangement" commonly includes forgivable loans. (Richards Dep. at 62–63).[21] Moreover, Defendants submit the affidavit of one of the creators of the WPP plan, who avers that the term special payout arrangement was intended to cover employee forgivable loans (and were in fact the only type of special payout arrangement that CIBC had). (Duffy Aff. ¶ 7).

### C. Plaintiff's Breach of Fiduciary Duty Claims

■ Plaintiff's Count Six is brought pursuant to 29 U.S.C. § 1132(a)(3), which provides that a civil action may be brought

> by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan.

The Fourth Circuit has held that a plaintiff's claim brought pursuant to this section "is actually a claim for benefits where the resolution of the claim rests upon an interpretation and application of *an ERISA-*

*regulated plan* rather than upon an interpretation and application of *ERISA."* *Smith v. Sydnor,* 184 F.3d 356, 362 (4th Cir.1999). "[W]hen a plaintiff is merely claiming that a fiduciary misinterpreted or misapplied an ERISA plan, the proper avenue for relief is a § 1132(a)(1)(B) claim for denial of benefits, not a claim for breach of fiduciary duty." *Fuller v. Liberty Life Assurance of Boston,* 302 F.Supp.2d 525, 533 (W.D.N.C.2004); *see also Varity Corp. v. Howe,* 516 U.S. 489, 515, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996) (noting that where Congress has provided adequate relief for a beneficiary's purported injury, there is no need for further equitable relief); *Griggs v. E.I. DuPont de Nemours & Co.,* 237 F.3d 371, 385 (4th Cir.2001) (relief is not "appropriate" equitable relief for purposes of § 502(a)(3) if Congress elsewhere provided adequate relief for beneficiary's injury and there is no need for further equitable relief); *Dwyer v. Metropolitan Life Ins. Co.,* 4 Fed.Appx. 133, 142, 2001 WL 94749 at *8 (4th Cir. 2001). Accordingly, to the extent that Plaintiff seeks to recover benefits due to him under the LTD plan or WPP by claiming that Defendants misinterpreted or misapplied those plans to him, his claim is properly brought under § 1132(a)(1)(B), and not § 1132(a)(3).

■ Moreover, even if the court were to consider the claim on the merits, Plaintiff has failed to establish that Defendants' interpretations and applications of the long term disability and WPP plans constituted breaches of duty. To establish a claim under § 1132(a)(3), the plaintiff must show: (1) that defendants were fiduciaries of the ERISA plan; (2) that defendants

---

21. The court also rejects Plaintiff's suggestion that Will Lobb testified that a forgivable loan is not a special payout arrangement. As Defendants point out, Lobb testified that he was not very familiar with the WPP, and that an upfront forgivable loan was not the same

thing as a commission payout. (Lobb Dep. at 15, 18, 32). Thus, Lobb's testimony has no bearing on whether an upfront forgivable loan constitutes a "payout in excess of the Firm's Standard Commission Payout Policy."

breached their fiduciary responsibilities under the plans; and (3) that the participant is in need of injunctive or "other appropriate equitable relief" from the court to remedy the violation or enforce the plan. *Griggs,* 237 F.3d at 379–80. Here, even assuming that Defendants were fiduciaries of both plans (a proposition which the court has already rejected with respect to the LTD plan), Defendants aided Plaintiff in the resolution of his claim for benefits under the UNUM long term disability plan, and paid Plaintiff all monies contained in his WPP account (Asman Aff. ¶, ¶ 9, 10; Richards Aff. ¶ 19). As detailed above, Plaintiff has simply failed to prove that CIBC withheld his enrollment in a supplemental benefits plan, or that he was entitled, by the terms of the WPP, to the Firm Initial Credit. Accordingly, no genuine issues of material fact exist as to whether Defendants breached a duty owed to Plaintiff. *See, e.g., Fuller,* 302 F.Supp.2d at 533 ("Since the Court concludes that this decision was consistent with the terms of the Disability Plan, it did not constitute a breach of fiduciary duty."); *Cf. Graham v. PACTIV Corp. Benefits Committee,* 301 F.Supp.2d 483, 498 (E.D.Va.2004) (holding that an ERISA retirement plan administrator did not breach any fiduciary duties by failing to provide the plan participant with pension benefits at a higher amount, reinstatement to his job, back pay, or reinstatement to the plan, even if the participant had retired in reliance on information from an agent that processed claims for the plan indicating a much higher pension benefit and the agent's erroneous benefit estimate was based on incorrect information regarding the length of the participant's participation in the plan). The court therefore grants Defendants' motion for summary judgment on Plaintiff's § 1132(a)(3) claims.

**D. Defendants' Request for Attorney's Fees**

▮▮▮▮ Defendants' final request is that, should the court decide on summary judgment in CIBC's favor, the court also award attorney's fees and costs pursuant to 29 U.S.C. § 1132(g). An award for reasonable attorney's fees and costs under ERISA is within the discretion of the court. *See Quesinberry v. Life Ins. Co. of North America,* 987 F.2d 1017 (4th Cir. 1993) (construing 29 U.S.C.A. § 1132(g)). In *Quesinberry,* the Fourth Circuit established a five factor test to guide the court's discretion in awarding attorney's fees under ERISA. *Id.* The factors include (1) the degree of the opposing party's culpability or bad faith; (2) the ability of opposing parties to satisfy an award of attorney's fees; (3) whether an award of fees against the opposing parties would deter other persons acting under similar circumstances; (4) whether the parties requesting attorney's fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA itself, and (5) the relative merits of the parties position. 987 F.2d at 1029. "This five factor approach is not a rigid test, but rather provides general guidelines for the district court in determining whether to grant a request for attorney's fees." *Id.*

▮▮▮ Weighing these factors, the court concludes that the award of attorney's fees in this case is not warranted. The court does not believe Plaintiff's actions in seeking benefits constitute bad faith, nor does the court believe that an award of attorney's fees would deter other individuals in Plaintiff's position. Moreover, Defendants' actions in this litigation have not been in an attempt to benefit all participants or beneficiaries of an ERISA plan or to resolve a significant question of ERISA law; rather, Defendants' less altruistic motiva-

tion has been to defend itself against claims for benefits not due. Accordingly, Defendants' request for attorney's fees is denied.

## CONCLUSION

It is therefore **ORDERED**, for the foregoing reasons, that Defendants' Motion for Summary Judgment is hereby **GRANTED**. It is further **ORDERED** that Plaintiff's Motion for Summary Judgment is **DENIED**.

**AND IT IS SO ORDERED.**